WISEMAN et al. v. TANNER et al. (CITY OF SEATTLE, Intervener), and three other cases.

(District Court, W. D. Washington, N. D.   December 24, 1914.
Dissenting Opinion, December 29, 1914.)

Nos. 49, 50, 20–E, 2064.

1. INJUNCTION ⬅85—JURISDICTION—ENJOINING ENFORCEMENT OF CRIMINAL STATUTE.

The general rule that equity will not enjoin criminal proceedings is subject to an exception, where property rights will be destroyed by criminal proceedings under an unconstitutional or invalid statute.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 155, 156; Dec. Dig. ⬅85.]

2. CONSTITUTIONAL LAW ⬅81—POLICE POWER OF STATES—REGULATION OF BUSINESS.

A state may, under its police power, adopt any act which reasonably protects its citizens, or a class of citizens, from fraud or extortion; and whether the necessity for such an act exists is a matter to be determined in the exercise of legislative discretion, which is not subject to judicial review.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 148; Dec. Dig. ⬅81.]

3. CONSTITUTIONAL LAW ⬅81—POLICE POWER—REGULATING EMPLOYMENT AGENCIES.

Initiative Act No. 8 of the state of Washington, adopted by the electors of the state November 3, 1914, which declares that the system of collecting fees from workers for furnishing them with employment, or with information leading thereto, results frequently in their becoming the victims of imposition and extortion, and is therefore detrimental to the welfare of the state, and which makes it unlawful for any employment agent to demand or receive from any person seeking employment any remuneration or fee for furnishing such employment, or information leading thereto, is within the police powers of the state, and constitutional.

[Ed. Note.—For other cases, see Constitutinal Law, Cent. Dig. § 148; Dec. Dig. ⬅81.]

Cushman, District Judge, dissenting.

In Equity. Suit by R. B. Wiseman and others against W. V. Tanner, as Attorney General of the State of Washington, and John F. Murphy, as Prosecuting Attorney of King County, in which the City

of Seattle intervened, with three other cases. On motion for temporary injunction. Denied.

Brightman, Halverstadt & Tennant, of Seattle, Wash., for complainants Wiseman and others.

Edward J. Cannon, of Spokane, Wash., for complainants Adams and others.

W. V. Tanner, Atty. Gen., and C. J. France, Asst. Atty. Gen., of Washington, for defendant state of Washington.

John F. Murphy, Pros. Atty., and Robert H. Evans, Asst. Pros. Atty., both of Seattle, Wash., for defendant King County.

James E. Bradford, Corp. Counsel, and Ralph S. Pierce, Asst. Corp. Counsel, both of Seattle, Wash., for intervener city of Seattle.

Lorenzo Dow, Pros. Atty., of Tacoma, Wash., for defendant Pierce County.

George H. Crandrall, of Spokane, Wash., for defendant Spokane County.

Before GILBERT, Circuit Judge, and CUSHMAN and NETERER, District Judges.

NETERER, District Judge. A bill in equity is filed by complainants, praying an injunction against the enforcement of the provisions of initiative measure No. 8, adopted by the majority of the electors of the state of Washington, voting for and against the measure, at the general election held on November 3, 1914. After alleging jurisdictional facts, it is charged that said act violates the provisions of section 1 of the fourteenth amendment to the Constitution of the United States, in that it deprives these plaintiffs. and each of them, of their liberty and property without due process of law, and denies to them the equal protection of the law; that it is in violation of section 10 of article 1 of the federal Constitution; that it is in violation of sections 3 and 12 of article 1 of the Constitution of the state of Washington.

Affidavit of plaintiffs is filed in support of the motion for temporary injunction, verifying the allegations of the complaint, and in which it is alleged that the plaintiffs have always been frank and honest with all persons dealing with them in seeking employment; that charges have been reasonable; that they have generally returned to applicants for employment any fees paid, if the labor was not satisfactory; that the charges for securing employment run from 75 cents to $9 each, depending upon the position which is provided; that the value of the business is from $3,000 to $5,000; and that the enforcement of the act would destroy the business, and an interruption would occasion irreparable loss.

The defendants have filed a motion to dismiss, upon the ground that said bill of complaint does not state facts sufficient to warrant this court in granting any relief to the plaintiffs, that plaintiffs have a plain, speedy, and adequate remedy at law, and that this court has no jurisdiction over the persons of the defendants, or either of them, upon the subject-matter of this action, and have filed controverting affidavit of E. P. Marsh, president of the State Federation of Labor, an

organization embracing every organized trade of the state except the railroad brotherhoods, and for five years manager of the Everett Labor Temple, "a place where men, organized and unorganized alike, drifted to constantly with reports of industrial hardships imposed upon them," who states:

That he has "been in contact with laboring men of all classes, skilled and unskilled. During the past two years I have been constantly traveling about the state of Washington, visiting every industrial center and many of the smaller towns. * * * It is often hard to get evidence of actual fraud against these agencies that will stand court test. This is in part due to reluctance and inability of victims of employment agents to appear in court. Again, it is also due to the pseudo fraudulent character of representations made by the agencies. * * * That I have visited scarcely a section of this state that I have not heard stories of alleged collusion between private employment agencies and foremen, superintendents, or other agents of employers, the system being apparently to keep men employed for a brief period of time, discharging them to make room for others, the obvious deduction being that the fee was divided between such agencies and such foremen or employers, and that 'the more men employed the bigger the split' "

—and corroborates the contravening affidavit made by D. P. Kenyon, an examiner in the office of the labor commission of the city of Seattle, and sole labor adjuster in the office of said labor commission, who swears that 75 per cent. of all labor complaints have been meritorious from the labor standpoint, and arise out of the wrongs perpetrated by plaintiff and other agencies; that—

"the actual experience, study, and observation of your affiant clearly show that the natural, usual, and inevitable tendency of the employment agency system as conducted in the state of Washington leads to a shortening of the length of employment; that the said system is based solely on the desire on the part of the employment agents to secure fees, and all the money they can, and by reason of such desire and conditions the shorter the time of employment the greater the number of jobs. * * * That generally the applicants, or such employés, who are seeking work, are poor and without money or other means, and are unable to bear the burden of paying the fee demanded and extracted or extorted from them by such agencies. That all of my said experience, observation, and study show such conditions obtain and substantially are of the same character and extent throughout the entire state of Washington"

—and charges collusion between agencies and managers of employers which results in shorter time of employment to increase the number of "jobs."

Mr. A. H. Grout, secretary of the municipal civil service commission and ex officio labor commissioner, corroborates the affidavit of D. P. Kenyon, and further says:

"I also reached the conclusion prior to the adoption of said initiative measure that the only efficient method of regulating the private employment agencies of said state was to prohibit the charging by said agencies of fees to persons seeking employment, and after consultation with other persons engaged in similar official positions to that which I hold I find that it is the general opinion that the prohibition of the taking of fees from those seeking employment is the only efficient manner of regulating said private employment agencies and the curing and preventing of the many abuses which arise in the conducting of said businesses as heretofore practiced."

James R. Bradford, now and for three years corporation counsel of the city of Seattle, in addition to other matters, states that he has

been frequently called upon by the labor commission of Seattle and the labor department to aid in the adjustment of settlements of complaints or claims lodged in the said labor commission by employés against employment agents in said city, and says:

"I have read and know the contents of the controverting affidavit of Mr. D. P. Kenyon, and personally know that a great deal of time of said legal department during all of said period has been consumed in aiding the said labor department in the adjustment and settlement of such complaints, and that very much time and attention has been given by said labor department in the adjustment and settlement of such claims. That during said times said employment agencies have, among others, resorted to various forms of artifices, false representations, and fraud to and in dealing with employés, for the purpose of extracting and extorting money and fees from such applicants; that such false representations, wrongs, and injustice consist, among other things, in statements to such applicants as to the amount of wages they will secure, the sanitary and other conditions in and about the camps at the places of work, the number of hours they will be required to labor each day, the price and character of board and lodging furnished by the employers, the relative distances and miles to the various places of work, and the cost and nature of such transportation, and other similar matters."

Complainants have filed a reply affidavit, setting out "An ordinance to license and regulate certain trades and occupations in the city of Seattle, and providing penalties for the violation thereof," in which ordinance the city of Seattle seeks to regulate employment agencies, and complainants allege compliance with the provisions of the ordinance, and further state:

"That heretofore, on or about the 17th day of November, 1914, in the city of Seattle, the said Kenyon attended a meeting of some of the plaintiffs above named, among whom were Crane, Rafter, Moore, Wiseman, Lilyman, and B. W. Sawyer, at which time the said Halverstadt asked Kenyon if he had any trouble whatever with any of the employment agents which Halverstadt represented, and Kenyon replied he had had no trouble with them whatsoever, and that it was not necessary for anybody to look after them; that there were only three or four agencies in the city which had ever made him any trouble."

The act in issue reads:

"An act to prohibit the collection of fees for the securing of employment or furnishing information leading thereto and fixing a penalty for violation thereof.

"Be it enacted by the people of the state of Washington:

"Section 1. The welfare of the state of Washington depends on the welfare of its workers and demands that they be protected from conditions that result in their being liable to imposition and extortion.

"The state of Washington, therefore, exercising herein police and sovereign power, declares that the system of collecting fees from the workers for furnishing them with employment, or with information leading thereto, results frequently in their becoming the victims of imposition and extortion and is therefore detrimental to the welfare of the state.

"Sec. 2. It shall be unlawful for any employment agent, his representative, or any other person to demand or receive either directly or indirectly from any person seeking employment, or from any person in his or her behalf, any remuneration or fee whatsoever for furnishing him or her with employment or with information leading thereto.

"Sec. 3. For each and every violation of any of the provisions of this act the penalty shall be a fine of not more than $100.00 and imprisonment for not more than thirty days."

[1] The motion to dismiss for want of jurisdiction will be denied. The case will be treated as falling within the exception to the general rule that equity will not enjoin criminal proceedings, the exception being where property rights will be destroyed by criminal proceedings under an invalid law or unconstitutional act. It would be useless to set out in this opinion the sections referred to of the Constitution of the United States or of the Constitution of the state of Washington.

A consideration of the act with relation to the welfare clause and property and contract provision of the Constitution will suffice, and reference to the contents of affidavits in support of the respective contentions is made in view of the statement in the act that "the welfare of the state * * * depends on · the welfare of its workers, and * * * that they be protected from * * * imposition and extortion," for the purpose of showing that there was some agitation with relation to the issue tendered by the act.

Welfare, as defined by Webster, is:

"Well-doing or well-being, in any respect; the enjoyment of health and common blessings of life; exemption from any evil or calamity; prosperity; happiness."

"The good and welfare of this commonwealth, for which reasonable orders, laws, statutes, and ordinances may be made, by force of which private rights of property may be affected, is a much broader and less specific ground of exercise of power than public use and public service. The former expresses the ultimate purpose or result sought to be obtained by all forms of legislative power over property; the latter implies a direct relation between the primary object of appropriation and the public enjoyment." . Lowell v. City of Boston, 111 Mass. 454, 15 Am. Rep. 39.

[2] The state, under its police power, can adopt any act which reasonably protects its citizens, or a class of citizens, from fraud and extortion.

" 'Police power,' in its broadest acceptation, * * * means 'the general power of the government to preserve and promote the public welfare, even at the expense of private rights.' " City of Geneva v. Geneva Telephone Co., 30 Misc. Rep. 236, 240, 62 N. Y. Supp. 172, 173; Karasek v. Peier, 22 Wash. 419, 61 Pac. 33, 50 L. R. A. 345.

"We hold that the police power of the state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety." Harlan, J., in C., B. & Q. Ry. Co. v. Ill., 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175.

"The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community. * * * For the pursuit of any lawful trade or business, the law imposes similar conditions. Regulations respecting them are almost infinite, varying with the nature of the business." Field, J., in Crowley v. Christiensen, 137 U. S. 86, 11 Sup. Ct. 13, 34 L. Ed. 620.

"The power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its welfare and prosperity." Field, J., in Barbier v. Connolly, 113 U. S. 31, 5 Sup. Ct. 359, 28 L. Ed. 923; Fuller, J., in Re Kemmler, 136 U. S. 436, 10 Sup. Ct. 930, 34 L. Ed. 519.

"The police power is not subject to any definite limitations, but is co-extensive with the necessities of the case and the safeguard of the public

interests." Brown, J., in Camfield v. U. S., 167 U. S. 518, 17 Sup. Ct. 864, 42 L. Ed. 260.

"What is termed the 'police power' has been the subject of a good deal of consideration by both the federal and state courts. and all agree that it is a difficult matter to define the limits within which it is to be exercised. Every well-organized government has the inherent right to protect the health and provide for the safety and welfare of its people. It has not only the right, but it is a duty and obligation which the sovereign power owes to the public; and, as no one can foresee the emergency or necessity which may call for [the] exercise [of this power], it is not an easy matter to prescribe the precise limits within which it may be exercised. It may be said to rest upon the maxim, 'Salus populi suprema lex.'" Deems v. City of Baltimore, 80 Md. 164, 173, 30 Atl. 648, 650 [26 L. R. A. 541, 45 Am. St. Rep. 339].

"'Police power' is defined by Blackstone to be the 'regulation and domestic order of the kingdom, whereby the inhabitants of a state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood and good manners, and to be decent, industrious and inoffensive in their respective stations.' It is said that by general police power of the state, persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state." In re Marriage License Docket, 4 Pa. Dist. Ct. 162.

"'Police power' is the power of the state to prescribe regulations to promote the * * * good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity." Bell's Gap R. Co. v. Commonwealth of Pa., 134 U. S. 232, 10 Sup. Ct. 533, 33 L. Ed. 892; Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205.

"The power which the Legislature has to promote the general welfare is very great, and the discretion which that department of the government has in the employment of means * * * is very large." Powell v. Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253.

The power which local authorities have to promote the general welfare of the state, when applied to the instant case, where the act in issue was adopted by each elector of the state recording his conclusion, and a majority thinking that an evil existed which should be regulated in the manner indicated by the act, would seem to be conclusive, when taken in connection with the language of Justice Day, in Missouri Pacific Railway Co. v. City of Omaha, 235 U. S. 121, 35 Sup. Ct. 82, 59 L. Ed. ——, in which he says:

"The local authorities are presumed to have knowledge of local conditions, and to have been induced by competent reason to take the action which they did."

This was an action to restrain the enforcement of an ordinance passed March 29, 1910, by the defendant city, in which the railway company was ordered to erect, construct, and complete the viaduct and approaches on Dodge street, of the width, height, strength, and of the material and manner of construction required by the city engineer of Omaha, and according to the plans and specifications prepared by him. The ordinance was attacked upon the ground that defendant's rights, guaranteed by the Constitution of the United States and the Constitution of the state of Nebraska were infringed, and the court declined to interfere.

The Supreme Court, in Otis et al. v. Parker, 187 U. S. 609, 23 Sup. Ct. 170, 47 L. Ed. 323, says:

"If the state thinks an admitted evil cannot be prevented, except by prohibiting a calling or transaction not in itself necessarily objectionable, the courts cannot interfere, unless, in looking at the substance of the matter, they can see that 'it is a clear, unmistakable infringement of rights secured by the fundamental law.'"

That an admitted evil exists is not only set forth in the act, but by the affidavits of the several parties to this proceeding, in which the condition is shown to exist, and against which the municipalities have legislated. Justice Day, in Schmidinger v. Chicago, 226 U. S. 578, 33 Sup. Ct. 182, 57 L. Ed. 364, Ann. Cas. 1914B, 284, says:

"This court has had frequent occasion to declare that there is no absolute freedom of contract. The exercise of the police power fixing weights and measures and standard sizes must necessarily limit the freedom of contract which would otherwise exist. Such limitations are constantly imposed upon the right to contract freely, because of restrictions upon that right deemed necessary in the interest of the general welfare."

This expression was brought forth upon the charge that the fourteenth amendment to the national Constitution was violated by the municipality of Chicago, in regulating the size of loaves of bread manufactured and sold within the city. The court held that the right of the municipality to regulate one trade and not another is well settled as not denying the equal protection of the laws, and that such regulation is not contrary to the due process clause and does not interfere with the liberty of contract.

Justice Hughes, for the court, in C., B. & Q. R. R. Co. v. McGuire, 219 U. S. 549, 31 Sup. Ct. 259, 55 L. Ed. 328, in considering an act of the Legislature of Iowa, making railway corporations liable in damages for injuries sustained by any person, including employés, in consequence of the neglect, mismanagement, or willful wrongs of the employés or agents of such corporations, in which it was held that the act did not interfere with the liberty to make contracts or deny the equal protection of the laws under the fourteenth amendment to the Constitution of the United States, said:

"There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community."

And:

"It is subject, also, in the field of state action, to the essential authority of government to maintain peace and security, and to enact laws for the promotion of the health, safety, morals, and welfare of those subject to its jurisdiction."

In Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487, Justice Holmes, for the court, said:

"It may be said in a general way that the police power extends to all the great public needs. * * * It may be put forth in aid of what is sanctioned by usage, or held by prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

That the act in issue was adopted by popular vote of the state emphasizes immediate necessity therefor to the public welfare. In Halter v. Nebraska, 205 U. S. 40, 27 Sup. Ct. 421, 51 L. Ed. 696, 10 Ann. Cas. 525, Justice Harlan, for the court, said:

"Another vital principle is that, except as restrained by its own fundamental law, or by the supreme law of the land, a state possesses all legislative power consistent with a republican form of government; therefore, each state, when not thus restrained and so far as this court is concerned, may, by legislation, provide * * * for the common good, as involved in the well-being, peace, happiness, and prosperity of the people."

In Knoxville Iron Co. v. Harrison, 183 U. S. 13, 22 Sup. Ct. 1, 46 L. Ed. 55, in a decision involving an act of the state of Tennessee requiring the redemption in cash of store orders or other evidences of indebtedness issued by employers in payment of wages due to employés, Mr. Justice Shiras, for the court, said:

"Furthermore, the passage of the act was a legitimate exercise of police power, and upon that ground also the legislation is well sustained. The first right of a state, as of a man, is self-protection, and with the state that right involves the universally acknowledged power and duty to enact and enforce all such laws not in plain conflict with some provision of the state or federal Constitution as may rightly be deemed necessary or expedient for the safety, health, morals, comfort and welfare of its people."

In Murphy v. California, 225 U. S. 623, 32 Sup. Ct. 697, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153, in passing upon the constitutionality of an ordinance passed by the city of Pasadena, Justice Lamar said:

"The fourteenth amendment protects the citizen in his right to engage in any lawful business, but it does not prevent legislation intended to regulate useful occupations which, because of their nature or location, may prove injurious * * * to the public."

From the record, it is apparent that the business, good order, and welfare of the state is involved, and the electors having expressly stated in the act that the welfare of the state demands the adoption of the provisions of the act seeking to regulate the agencies named, the courts cannot examine into local conditions.

"All property in this commonwealth is * * * subject to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations, established by law, as the Legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient." Chief Justice Shaw, Parker v. Otis, 130 Cal. 322, 62 Pac. 571, 927, 92 Am. St. Rep. 56.

In many ways and phases has the issue here been before the Supreme Court of the United States, and in all of the cases has the exercise of legislative discretion been held not to be subject to judicial review in the absence of arbitrary restraint. Gundling v. Chicago, 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725; Petit v. Minnesota, 177 U. S. 164, 20 Sup. Ct. 666, 44 L. Ed. 716; Austin v. Tennessee, 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224; Booth v. Illinois, 187 U. S. 425, 22 Sup. Ct. 425, 46 L. Ed. 623; Jacobson v. Massachusetts, 197 U. S. 11, 25

Sup. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765; Patterson v. The Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002.

In Powell v. Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253, the Supreme Court held unconstitutional an act of the Pennsylvania Legislature prohibiting the manufacture or sale of oleomargarine or adulterated substitute for butter or cheese. Justice Harlan, for the court, while assenting to the general proposition advanced by defendant that his enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade is an essential part of his rights of liberty and property, as guaranteed by the fourteenth amendment, says:

"But it cannot adjudge that the defendant's rights of liberty and property, as thus defined, have been infringed by the statute of Pennsylvania, without holding that, although it may have been enacted in good faith for the objects expressed in its title, * * * it has, in fact, no real or substantial relation to these objects. * * * The court is unable to affirm that this legislation has no real or substantial relation to such objects."

And again:

"Whether the manufacture of oleomargarine * * * is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such a manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative department to determine. And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination of those questions is conclusive upon the courts. * * * The power which the Legislature has to promote the general welfare is very great, and the discretion which that department of the government has in the employment of means to that end is very large."

The Supreme Court of the United States, in Central Lumber Co. v. South Dakota, 226 U. S. 159, 33 Sup. Ct. 67, 57 L. Ed. 164, upheld the constitutionality of an act of the state Legislature of South Dakota making it a penal offense for any person engaged in the production, manufacture, or distribution of any commodity in general use to discriminate as to price or rate between different sections or communities in the state. Mr. Justice Holmes, for the court, said:

"The fourteenth amendment does not prohibit legislation special in character. Magoun v. Ill. Trust & Sav. Bank, 170 U. S. 283, 294 [18 Sup. Ct. 594, 42 L. Ed. 1037]. It does not prohibit a state from carrying out a policy that cannot be pronounced purely arbitrary by taxation or penal laws. * * * If a class is deemed to present a conspicuous example of what the Legislature seeks to prevent, the fourteenth amendment allows it to be dealt with, although otherwise and merely logically not distinguishable from others not embraced in the law."

And:

"If the Legislature thought that that particular manifestation of ability usually came from great corporations, whose power it deemed excessive, and for that reason did more harm than good in their state, and that there was no other case of frequent occurrence where the same could be said, we cannot review their economics or their facts."

In McLean v. Arkansas, 211 U. S. 539, 29 Sup. Ct. 206, 53 L. Ed. 315, the court had under consideration the constitutionality of a statute of Arkansas requiring coal to be measured, for payment of miner's wages, before screening, in all mines in the state employing more than ten men underground. The court held the act not to be in violation of the equal protection and contract clauses of the fourteenth amendment, and through Justice Day stated that while the Constitution provides for the protection of citizens in making contracts for the sale of labor, and protects the right to carry on trade or business against hostile state legislation, yet when the right to contract or carry on business conflicts with laws declaring the public policy of the state, enacted for the protection of the public * * * welfare, the same may be valid, notwithstanding they have the effect to curtail or limit the freedom of contract, and, further, that since the law is alike applicable to all mines in the state employing more than ten men underground, it is in no sense an unjust or unreasonable discrimination, and hence does not deprive defendants of the equal protection of the laws within the meaning of the Constitution.

In Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780, the court held not in violation of the contract, due process, or equal protection clauses of the fourteenth amendment a statute of the state of Utah limiting the employment of workmen underground to eight hours a day. Justice Brown, for the court, said:

"The question in each case is whether the Legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression or spoliation of a particular class."

Justice Field, for the court, in Barbier v. Connolly, 113 U. S. 31, 5 Sup. Ct. 357, 28 L. Ed. 923, stated in substance that while the fourteenth amendment was undoubtedly intended to protect citizens from arbitrary deprivation of life or liberty or arbitrary spoliation of property, and that equal protection should be given to all under like circumstances, yet that amendment—broad and comprehensive as it is—was not designed to interfere with the police power of the state to prescribe regulations to promote the good order of the people. To the same effect are Murphy v. California, 225 U. S. 623, 32 Sup. Ct. 697, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153; Bacon v. Walker, 204 U. S. 311, 27 Sup. Ct. 289, 51 L. Ed. 499.

[3] It is clearly apparent that what the regulation shall be and how to be administered are matters for the state, and a strong preponderant opinion being prevalent among the electors of the state, they having expressed at a general election that the public welfare required regulation as set forth in the act, and having declared that the evil existed and shall be met by prohibiting the collection of fees from a class of persons, the court cannot interfere, unless it appears that the act has no real or substantial relation to the evil sought to be remedied, which does not appear in this case. The court cannot say that the electors of the state, in adopting the act which declared that the welfare of the state required the prohibition of the collection of fees from the sources designated, did not exercise a reasonable discretion in declaring a public policy as in the act set forth.

The contention that the relief asked is in harmony with Little v. Tanner (D. C.) 208 Fed. 605. (this circuit), is not well taken. The issue there involved the constitutionality of a trading stamp act of the state of Washington. The court, at page 609, said:

"It is plainly manifest that no merchant could afford to pay the sum of $6,000 annually for the mere privilege of giving away trading stamps or allowing discounts on cash sales; but, if this were the only objection to the act, it may be that the courts would be powerless to enjoin its execution."

And on page 611:

"But inasmuch as the Supreme Court of the state of Washington has declared that an act prohibiting the use of trading stamps is in violation of the Constitution of that state, we accept its decision as final and conclusive here."

The license fee was held to be a tax in violation of the provisions of the fourteenth amendment.

The large number of decisions cited by complainants do not militate against or take from the quotations of the cases herein referred to. The public welfare is the determining factor, and the expressed conclusion of the electors of the state is that the interest of the public generally requires the regulation provided by the act, and this is conclusive upon the court.

The fact that complainants may have conducted their business honestly, and in such a way that no complaint could be rightfully lodged against them, would not prevent the state from adopting the measure, if necessary to reach persons who have not so conducted their business, but, as stated before the bar, in such a way as to have three men for one job—one upon the job, one going to the job, and one coming from the job—and receiving compensation from all. The honest must suffer with the others in regulating the business of the general class. The act is within the police power of the state and does not infringe complainant's rights.

The motion for temporary injunction is denied, and the motion to dismiss the bill for want of equity is granted.

CUSHMAN, District Judge. I dissent from the opinion of the majority of the court in one important particular. While agreeing with them that this cause comes within the exception to the general rule forbidding the injunction of criminal proceedings, and agreeing that the act attacked does not violate the eleventh amendment to the Constitution, and while agreeing further that the employment agency business may be regulated to any reasonable extent, I dissent from the conclusion that the act in question is an act to regulate, reasonably or otherwise, this business, as it clearly appears to be one destroying and prohibiting the business of such agencies, where neither public health, safety, nor morals are concerned. If such business includes in it no harmful element, but when properly conducted, is alone beneficial, then, under the Constitution, neither Legislature nor electorate can strike it down, or prohibit it. To do so violates the fourteenth amendment to the Constitution, and deprives those in that business of their liberty and property without due process of law.

The majority opinion holds that the act is one for the regulation,

and not prohibition, of employment agencies. The preamble of the act provides:

"An act to prohibit the collection of fees for the securing of employment or furnishing information leading thereto and fixing a penalty for violation thereof."

Section 2 provides:

"It shall be unlawful for any employment agent, his representative, or any other person to demand or receive either directly or indirectly from any person seeking employment, or from any person on his or her behalf, any remuneration or fee whatsoever for furnishing him or her with employment or with information leading thereto."

In the official publication of the secretary of the state of Washington of the initiative acts voted on at the election November 3, 1914, with the arguments for and against, there appears the initiative in question. It is headed as follows:

"An act to be submitted to the legal voters of the state of Washington for their approval or rejection at the general election to be held on Tuesday, the third day of November, 1914, proposed by Initiative Petition No. 8, filed in the office of the secretary of state, July 3, 1914, commonly known as Abolishing Employment Offices Measure."

The business of employment agencies consists of remuneration for finding employment for those who seek it, or informing them where it can be found. To say that the taking away of any remuneration or fee for this service is regulation, and not prohibition, of the business, is to lose sight of what business is. Take away the remuneration for conducting it, and there is no business left. It would then become only a benevolent agency.

Upon the argument, the only suggestion made that the act did not prohibit business was that, under it, employers might still pay the employment agencies a fee for seeking employés, and thereby the business continue. There are two essential fallacies in this argument:

The affidavits filed show that the only income of the complainants is derived from fees charged the laborers for whom they seek employment. First, the business, as established and carried on, is one for the sale of labor, or to find a sale for labor, and not to buy it. Labor differs from other commodities in this: The laborer may, on opportunity, sell his own labor; but, necessarily, busied with his toil in a complex commercial system such as ours, his opportunity is poor compared with that of an experienced and established agency engaged in the business of finding opportunities for employment. Whatever business is considered and analyzed, it is one of sale. Before there can be a sale, there must be something to sell. Uniformly, a buyer buys for his needs, but a seller's business is to sell. Where buying is part of a business, it is merely a preparation for sale.

The second fatal weakness in this argument is that, if this act forbidding the taking of a fee from the employé is valid, another act may forbid the taking of one from the employer. Thus, by admitting the validity of this act, the power is conceded, not only to fell the trunk, but to destroy the root and branch. This is not regulation. The only support—if it may be so termed—in the record for the position that this act is one of regulation, and not prohibition, is found in the affi-

davits filed and presumably prepared by the Attorney General, wherein the act is painstakingly referred to as one growing out of the need for regulation of this business. The denial to a man of the right to sell .his labor, the denial of. the right to hire some one to·sell his labor, and, as a. necessary corollary, the right of the agent to sell his services for the securing of such employment, is prohibition of the business. If you forbid an agent to take a fee for the house he rents or sells, you necessarily stop his business.

There has been no contention nor holding that there is aught save good in an employment agency honestly conducted. Upon consideration, it will be conceded that few callings could be more worthy than finding honest employment, and thereby honest independence, for a man who wants to work and who cannot find the opportunity. An agency not inherently harmful, which secures labor for the unemployed, is beneficial. In re Dickey, 144 Cal. 234, 77 Pac. 924, 66 L. R. A. 928, 103 Am. St. Rep. 82, 1 Ann. Cas. 428, the Supreme Court of California held unconstitutional a statute limiting the charges which the owner of an employment agency might make for his services. In the course of the opinion, it is said:

"It appears, therefore, that the due exercise of the police power is limited to the preservation of the public health, safety, and morals, and that legislation which transcends these objects, whatever other justification it may claim for its existence, cannot be upheld as a legitimate police regulation. The business in which this defendant is engaged is not only innocent and innocuous, but is highly beneficial, as tending the more quickly to secure labor for the unemployed. There is nothing in the nature of the business, therefore, that in any way threatens or endangers the public health, safety, or morals, nor, indeed, is the purpose of this statute to regulate in these regards, or in any of them. The declared purpose and the plain effect of the above-quoted section is to limit the right of an employment agent in making contracts—a right free to those who follow other vocations—and arbitrarily to fix the compensation which he may receive for the services which he renders." 144 Cal. at page 236, 77 Pac. at page 925, 66 L. R. A. at page 929, 130 Am. St. Rep. at page 83, 1 Ann. Cas. at page 429.

The Supreme Court of the state of Washington, in Spokane v. Macho, 51 Wash. 322, 98 Pac. 755, 21 L. R. A. (N. S.) 263, 130 Am. St. Rep. 1100, in holding the employment agency business legitimate and beneficial, said:

"It cannot be denied that the business of the employment agent is a legitimate business, as much so as is that of the banker, broker, or merchant; and under the methods prevailing in the modern business world, it may be said to be a necessary adjunct in the prosecution of business enterprises."

In Williams v. Fears, 179 U. S. 270, 21 Sup. Ct. 128, 45 L. Ed. 186, the court, in considering the employment agency business, said:

"The court [state court] called attention to the fact that, while previous acts had required a license, this act provided for a specific tax on the occupation of emigrant agents in common with very many other occupations, the declared purpose of the levy being for the support of the government, and ruled that the question of whether the tax was so excessive as to amount to a prohibition on the transaction of that business, did not arise, and, indeed, was not raised [as in Little v. Tanner (D. C.) 208 Fed. 605]. * * * But this act is a taxing act. * * * The individual laborer is left free to come and go at pleasure, and to make such contracts as he chooses, while those whose business it is to induce persons to enter into labor contracts and to change their location, though left free to contract, are subjected to taxation in respect of

their business as other citizens are. * * * The general legislative purpose is plain, and the intention to prohibit this particular business cannot properly be imputed from the amount of the tax payable by those embarked in it, even if we were at liberty on this record to go into that subject. It would seem, moreover, that the business itself is of such nature and importance as to justify the exercise of the police power in its regulation. We are not dealing with single instances, but with a general business, and it is easy to see that, if that business is not subject to regulation, the citizen may be exposed to misfortunes from which he might otherwise be legitimately protected." 179 U. S. at pages 273, 274, 275, 21 Sup. Ct. at pages 129, 130 (45 L. Ed. 186).

In the case of State v. Moore, 113 N. C. 697, 18 S. E. 342, 22 L. R. A. 472, the court held unconstitutional a law because of the excessive fee required by a statute of North Carolina from emigrant agents, who differ from employment agents only in that the emigrant agent employs persons to do work out of the state in which they are employed. The court held such business not inherently harmful to the public, and that it could be regulated, but not prohibited, by an exercise of the police power. When the interest the state has in the welfare of its citizens is considered, together with the fact that, without their employment and afforded opportunity for production, it could not exist, and the danger to the state in large numbers of unemployed, it is clear that the employment agency business is affected with a public interest, and that, if the law may be considered as a reasonable regulation, it should be upheld, but it is clear that it is not a regulation of the business, but the prohibition of the business.

If it be considered as regulation, it cannot be held reasonable, because it goes beyond the necessities of the case. All that is contended for is that the system, as conducted, has been at fault, that there has been collusion between agencies and managers of employers, and that employment agencies have resorted to various forms of artifices, false representations, and fraud in dealing with employés, for the purpose of extorting money and fees from such applicants, making false statements to applicants as to the amount of wages they would secure and as to other particulars concerning the promised employment. These defects and faults do not inhere in the business itself, but are the faults and wrongs of certain individuals engaged in that business. It is true, if you sink the ship, you rid yourself of the barnacles on its bottom; but it is not reasonably necessary.

However many agencies may exist for the finding of employment for men who want it, as long as there are unemployed, there is no reasonable excuse for the elimination of any business carried on for that purpose. The right to contract is not only the essence of liberty, but is a property right. This is a lawful business, arbitrarily and without reasonable cause prohibited. If the business, as conducted, is wrong, the regulation or prohibition should go to such conduct and not to the business.

"It is novel legislation, indeed, that attempts to take away from all the people the right to conduct a given business because there are wrongdoers in it, from whose conduct the people suffer. * * * Nor can the contention be tolerated that because there have been, in times past, dishonest persons engaged in the ticket brokerage business, with the result that frauds have been perpetrated on both travelers and transportation companies, therefore the Legislature can deprive every citizen engaged therein of the 'liberty' to fur-

ther conduct such business. Stringent rules undoubtedly may be enacted to punish those who are guilty of dishonest practices in the conduct of such a business and the machinery of the law put, in motion for its rigorous enforcement; but to cut up, root and branch, a business that may be honestly conducted, to the convenience of the public and the profit of the persons engaged in it, is beyond legislative power. If the law were otherwise, no trade, business, or profession could escape destruction at the hands of the Legislature if a situation should arise that would stimulate it to exercise its power, for in every field of endeavor can be found men that seek profit by fraudulent processes. Transportation tickets have been forged it is said; so have notes, checks, and bank bills. Railroad companies are no more bound to honor forged tickets than the alleged maker of a forged note is bound to pay it. An innocent person who suffers by parting with his money on a forged ticket has his remedy against the vendor, just the same as has the bank that discounts a forged note. Such instances might be multiplied, but it would serve no good purpose, for it is well known that no business can be suggested through which innocent parties may not be occasionally victimized. But because of that fact honest men cannot be prevented from engaging in their chosen occupations." People v. Warden, 157 N. Y. 116, 123, 131, 132, 51 N. E. 1006, 1008, 1011, 43 L. R. A. 264, 268, 271, 68 Am. St. Rep. 763, 767, 774.

All of the cases referred to in the majority opinion are either cases in which the court has upheld laws regulating the conduct of a lawful business, or regulating or prohibiting a business found to inherently have in itself essential elements of harm. None of the cases cited go as far as the present decision. While there may be language in certain of them that, taken in its broadest sense and divorced from consideration of the facts of the cause in which the language was used, might include the present holding, yet, when viewed in the light of the facts of the case in which it was used, in none of them does it do so.

In Petit v. Minnesota, 177 U. S. 164, 20 Sup. Ct. 664, 44 L. Ed. 716, a law was upheld forbidding labor on the Sabbath, except works of charity and necessity; such decision being on the ground that the legislation was not only in the interest of public morals, but of public health.

In Gundling v. Chicago, 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725, an ordinance was upheld requiring licenses in order to sell cigarettes.

Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780, upheld an act providing an eight-hour day in mines and smelters, upon the ground that those employments were dangerous and unhealthy. This was a law of regulation.

Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923, upheld an ordinance forbidding the operation of laundries within certain city limits at night, on the ground that it tended to secure the public safety and lessen the danger from conflagration.

C., B. & Q. Ry. v. Drainage Commissioners, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175, did not involve the constitutionality of a state law. The holding was that, where a railroad bridge was necessarily destroyed in enlarging the drainage capacity of a stream for the betterment of public health and other conditions, the destruction of the bridge was not the taking of property in the constitutional sense, that it was an incidental injury to the right of private property, and that it was only for the taking of property for a pub-

lic purpose that compensation must first be made under the Constitution. Neither was the railroad taken nor its business prohibited.

Otis v. Parker, 187 U. S. 606, 23 Sup. Ct. 168, 47 L. Ed. 323, upheld the validity of a provision in the Constitution of California that all contracts for the sale of shares of capital stock of corporations on margin should be void. This case in reality follows the case of Booth v. Illinois, 184 U. S. 425, 22 Sup. Ct. 425, 46 L. Ed. 623, as is shown by the reasoning of the court in Otis v. Parker:

"We cannot say that there might not be conditions of public delirium in which at least a temporary prohibition of sales on margins would be a salutary thing. Still less can we say that there might not be conditions in which it reasonably might be thought a salutary thing, even if we disagreed with the opinion. Of course, if a man can buy on margin, he can launch into a much more extended venture than where he must pay the whole price at once. If he pays the whole price, he gets the purchased article, whatever its worth may turn out to be. But if he buys stocks on margin he may put all his property into the venture, and being unable to keep his margins good if the stock market goes down, a slight fall leaves him penniless, with nothing to represent his outlay, except that he has had the chances of a bet. There is no doubt that purchases on margin may be and frequently are used as a means of gambling for a great gain or a loss of all one has. It is said that in California, when the Constitution was adopted, the whole people were buying mining stocks in this way with the result of infinite disaster." 187 U. S. at pages 609, 610, 23 Sup. Ct. page 170 [47 L. Ed. 323].

The court said in Booth v. Illinois:

"The argument then is that the statute directly forbids the citizen from pursuing a calling which, in itself, involves no element of immorality, and therefore by such prohibition it invades his liberty as guaranteed by the supreme law of the land. Does this conclusion follow from the premise stated? Is it true that the Legislature is without power to forbid or suppress a particular kind of business, where such business, properly and honestly conducted, may not, in itself, be immoral? We think not. A calling may not in itself be immoral, and yet the tendency of what is generally or ordinarily or often done in pursuing that calling may be towards that which is admittedly immoral or pernicious. If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the state thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law. Mugler v. Kansas, 123 U. S. 623, 661 [8 Sup. Ct. 273, 31 L. Ed. 205]; Minnesota v. Barber, 136 U. S. 313, 320 [10 Sup. Ct. 862, 34 L. Ed. 455]; Brimmer v. Rebman, 138 U. S. 78 [11 Sup. Ct. 213, 34 L. Ed. 862]; Voight v. Wright, 141 U. S. 62 [11 Sup. Ct. 855, 35 L. Ed. 638]. We cannot say, from any facts judicially known to the court, or from the evidence in this case, that the prohibition of options to sell grain at a future time has, in itself, no reasonable relation to the suppression of gambling grain contracts in respect of which the parties contemplate only a settlement on the basis of differences in the contract and market prices. Perhaps the Legislature thought that dealings in options to sell or buy at a future time, although not always or necessarily gambling, may have the effect to keep out of the market, while the options lasted, the property which is the subject of the options, and thus assist purchasers to establish, for a time, what are known as 'corners,' whereby the ordinary and regular sales or exchanges of such property, based upon existing prices, may be interfered with, and persons who have in fact no grain, and do not care to handle any, enabled to practically control prices. Or the Legislature may have thought that options to sell or buy at a future time were, in their essence, mere speculations in prices and tended to foster a spirit of gambling. In all this the Legislature of the state may have been mistaken.

If so, the mistake was not such as to justify the conclusion that the statute was a mere cover to destroy a particular kind of business not inherently harmful or immoral. It must be assumed that the Legislature was of opinion that an effectual mode to suppress gambling grain contracts was to declare illegal all options to sell or buy at a future time. The court is unable to say that the means employed were not appropriate to the end sought to be attained, and which it was competent for the state to accomplish." 184 U. S. at pages 429, 430, 22 Sup. Ct. at page 427 [46 L. Ed. 623].

Patterson v. Bark Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002, upheld a federal law prohibiting the payment of seamen's wages in advance. This was upheld under the commerce clause of the Constitution, and is essentially a regulation, and not prohibition, of employment.

Knoxville Iron Co. v. Harbison, 183 U. S. 13, 22 Sup. Ct. 1, 46 L. Ed. 55, upheld a law requiring, under certain conditions, redemption in cash by the employer of store orders given the employé. This was a regulation of the relation and dealings between employer and employé.

Austin v. Tennessee, 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224, upheld a law forbidding the sale of cigarettes, on the ground that it was not unreasonable to suppose that such law was designed for the protection of public health.

Halter v. Nebraska, 205 U. S. 34, 27 Sup. Ct. 419, 51 L. Ed. 696, 10 Ann. Cas. 525, upheld an act forbidding the use of any representation of the National flag for advertising purposes. The flag is the nation's, and both the state and nation are bound to protect and cherish it. It would not be unreasonable to conclude that anything that lessened regard for the nation's emblem—as making an advertising medium of it—would have in it an element of danger to the public. Such a law would not prohibit a lawful and beneficial business, but rather regulate the advertisement of the business.

Jacobson v. Massachusetts, 197 U. S. 11, 25 Sup. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765, upheld a compulsory vaccination law. Such a law affects the public health and safety, and the liberty of the individual is subject to needs to that end to be determined by the Legislature.

Missouri, Kansas & Texas Ry. Co. v. May, 194 U. S. 267, 24 Sup. Ct. 638, 48 L. Ed. 971, had to do with the equal protection clause and is not in point.

In Schmidinger v. City of Chicago, 226 U. S. 578, 33 Sup. Ct. 182, 57 L. Ed. 364, Ann. Cas. 1914B, 284, where the constitutionality of an ordinance of the city of Chicago was upheld which fixed the weights at which bread might be sold, the ordinance was one of regulation. In the course of the opinion, it is said:

"It has not fixed the price at which bread may be sold. It has only prescribed that the standard weight must be found in the loaves of the sizes authorized."

Such ordinance was one of pure regulation, as much so as the fixing of weights and measures has always been considered.

In Central Lumber Co. v. South Dakota, 226 U. S. 157, 33 Sup. Ct. 66, 57 L. Ed. 164, a law was upheld prohibiting unfair discrimination in sales or prices in different localities, substantially under the

same conditions. The Legislature did not prohibit the business, but condemned certain conduct in it.

Rosenthal v. New York, 226 U. S. 260, 33 Sup. Ct. 27, 57 L. Ed. 212, Ann. Cas. 1914B, 71, upheld a law requiring junk dealers to make diligent inquiry as to the legal right of sellers to certain kinds of property sold to them. The business was not forbidden.

Murphy v. California, 225 U. S. 623, 32 Sup. Ct. 697, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153, upheld an ordinance prohibiting the keeping of billiard halls, on the ground that the keeping of a billiard hall had a harmful tendency in and of itself, independent of the manner of its conduct, and therefore could be legally prohibited.

Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487, upheld an act subjecting state banks to assessments for a depositors' guaranty fund. This was regulation, but not prohibition, of a lawful business.

C., B. & Q. R. R. Co. v. McGuire, 219 U. S. 549, 31 Sup. Ct. 259, 55 L. Ed. 328, upheld an act prohibiting contracts limiting liability for injuries; the contract being made in advance of the injury received. This act was limited to railroads, which are common carriers. The prohibition was that of a contract that had in itself the seeds of oppression. It was a regulation between employer and employé, and not a prohibition of employment. This law was upheld as one incidental to the protection of public health. The court said:

"If the Legislature may require the use of safety devices, it may prohibit agreements to dispense with them. If it may restrict employment in mines and smelters to eight hours a day, it may make contracts for longer service unlawful. In such case the interference with the right to contract is incidental to the main object of the regulation, and if the power exists to accomplish the latter, the interference is justified as an aid to its exercise." 219 U. S. at page 570, 31 Sup. Ct. at page 263 [55 L. Ed. 328].

Kidd Dater Co. v. Musselman Grocer Co., 217 U. S. 461, 30 Sup. Ct. 606, 54 L. Ed. 839, upheld a sales in bulk act requiring tradesmen making sales in bulk of their stock in trade to give notice to the creditors. This was only a sale regulation, tending to prevent fraud. It did not deny the right of sale, but only prescribed the manner.

Welch v. Swasey, 214 U. S. 91, 29 Sup. Ct. 567, 53 L. Ed. 923, upheld a statute regulating the height of buildings in commercial and residence portions of a city. This was a regulation in the interest of public safety.

McLean v. Arkansas, 211 U. S. 539, 29 Sup. Ct. 206, 53 L. Ed. 315, upheld an act requiring coal to be measured for payment of the miner before screening, where the contract of employment measured the pay of the miner by the quantity mined. The court said:

"This law does not prevent the operator from screening the coal before it is sent to market; it does not prevent a contract for mining coal by the day, week or month. * * *

"We are unable to say, in the light of the conditions shown in the public inquiry referred to, and in the necessity for such laws, evinced in the enactments of the Legislatures of various states, that this law had no reasonable relation to the protection of a large class of laborers in the receipt of their just dues and the promotion of the harmonious relations of capital and labor engaged in a great industry in the state.

"Laws tending to prevent fraud and to require honest weights and measures in the transaction of business have frequently been sustained in the courts, although in compelling certain modes of dealing they interfere with the freedom of contract." 211 U. S. at pages 548, 550, 29 Sup. Ct. at pages 208, 209 [53 L. Ed. 315].

This, too, was regulation.

In Powell v. Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253, the court held that oleomargarine might itself be reasonably considered a counterfeit calculated to deceive the buying public, and that it was a legislative question to determine whether the ingredients of this substance, as generally sold, were harmful to the health of the public. In the course of the opinion the court said:

"Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute, is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative department to determine." 127 U. S. at page 685, 8 Sup. Ct. at page 996 [32 L. Ed. 253].

There is nothing in the present case that can be said to be similar in any way to these conditions. There is nothing in the business of an employment agency inherently wrong, or tending towards wrong. It will probably always be that some of the unemployed will be poor, friendless, and among strangers, and therefore to be imposed upon with less danger than those more fortunately situated; but this fact does not show that the tendency of the business is in any way harmful. It simply affords the dishonest man in the business an opportunity to practice oppression. A business is not to be prohibited because persons affected by it are likely to be unfortunate. Given opportunity and a dishonest inclination in any business, imposition and fraud are likely to follow. Is it to be, therefore, held that all that is necessary to warrant the abolition of a business is that a large part of those affected by it are, in certain respects, subject to imposition?

That this initiative measure violates the fourteenth amendment to the Constitution in the respect pointed out is shown by the following authorities:

"The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways, to live and work where he will, to earn his livelihood by any lawful calling, to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned." Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 431 [41 L. Ed. 832].

"As the possession of property, of which a person cannot be deprived, doubtless implies that such property may be acquired, it is safe to say that a state law which undertakes to deprive any class of persons of the general power to acquire property would also be obnoxious to the same provision. Indeed, we may go a step further, and say that, as property can only be legally acquired as between living persons by contract, a general prohibition against entering into contracts with respect to property, or having as their object the acquisi-

tion of property, would be equally invalid." Holden v. Hardy, 169 U. S. 366, 391, 18 Sup. Ct. 383, 387 [42 L. R. A. 780].

"Life, liberty, property, and equal protection of the laws, as grouped together in the Constitution, are so related that the deprivation of any one may lessen or extinguish the value of the others. In so far as a man is deprived of the right to labor, his liberty is restricted, his capacity to earn wages and acquire property is lessened, and he is denied the protection which the law affords those who are permitted to work. Liberty means more than freedom from servitude; and the constitutional guaranty is an assurance that the citizen shall be protected in the right to use his powers of mind and body in any lawful calling." Smith v. Texas, 233 U. S. 630, 34 Sup. Ct. 681, 58 L. Ed. 1129.

In Lochner v. New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133, holding unconstitutional a statute of New York fixing the hours of labor for bakers, it is said:

"We think that there can be no fair doubt that the trade of baker, in and of itself, is not an unhealthy one to that degree which would authorize the Legislature to interfere with the right to labor, and with the right of free contract on the part of the individual, either as employer or employé. In looking through statistics regarding all trades and occupations, it may be true that the trade of a baker does not appear to be as healthy as some other trades, and is also vastly more healthy than still others. To the common understanding the trade of a baker has never been regarded as an unhealthy one. Very likely physicians would not recommend the exercise of that or of any other trade as a remedy for ill health. Some occupations are more healthy than others, but we think there are none which might not come under the power of the Legislature to supervise and control the hours of working therein, if the mere fact that the occupation is not absolutely and perfectly healthy is to confer that right upon the legislative department of the government. It might be safely affirmed that almost all occupations more or less affect the health. There must be more than the mere fact of the possible existence of some small amount of unhealthiness to warrant legislative interference with liberty. It is unfortunately true that labor, even in any department, may possibly carry with it the seeds of unhealthiness. But are we all, on that account, at the mercy of legislative majorities? A printer, a tinsmith, a locksmith, a carpenter, a cabinetmaker, a dry goods clerk, a bank's, a lawyer's, or a physician's clerk, or a clerk in almost any kind of business, would all come under the power of the Legislature, on this assumption. No trade, no occupation, no mode of earning one's living, could escape this all-pervading power, and the acts of the Legislature in limiting the hours of labor in all employments would be valid, although such limitation might seriously cripple the ability of the laborer to support himself and his family. In our large cities there are many buildings into which the sun penetrates for but a short time in each day, and these buildings are occupied by people carrying on the business of bankers, brokers, lawyers, real estate, and many other kinds of business, aided by many clerks, messengers, and other employés. Upon the assumption of the validity of this act under review, it is not possible to say that an act, prohibiting lawyers' or bank clerks, or others, from contracting to labor for their employers more than eight hours a day, would be invalid. It might be said that it is unhealthy to work more than that number of hours in an apartment lighted by artificial light during the working hours of the day; that the occupation of the bank clerk, the lawyer's clerk, the real estate clerk, or the broker's clerk in such offices is therefore unhealthy, and the Legislature in its paternal wisdom must therefore have the right to legislate on the subject of and to limit the hours of such labor, and if it exercises that power and its validity be questioned, it is sufficient to say it has reference to the public health, it has reference to the health of the employés condemned to labor day after each day in buildings where the sun never shines, it is a health law, and therefore it is valid, and cannot be questioned by the courts.

"It is also urged, pursuing the same line of argument, that it is to the interest of the state that its population should be strong and robust, and therefore any legislation which may be said to tend to make people healthy must

be valid as health laws, enacted under the police power. If this be a valid argument and a justification for this kind of legislation, it follows that the protection of the federal Constitution from undue interference with liberty of person and freedom of contract is visionary, wherever the law is sought to be justified as a valid exercise of the police power. Scarcely any law but might find shelter under such assumptions, and conduct, properly so called, as well as contract, would come under the restrictive sway of the Legislature. Not only the hours of employés, but the hours of employers, could be regulated, and doctors, lawyers, scientists, all professional men, as well as athletes and artisans, could be forbidden to fatigue their brains and bodies by prolonged hours of exercise, lest the fighting strength of the state be impaired. We mention these extreme cases because the contention is extreme. We do not believe in the soundness of the views which uphold this law. On the contrary, we think that such a law as this, although passed in the assumed exercise of the police power, and as relating to the public health, or the health of the employés named, is not within that power, and is invalid. The act is not, within any fair meaning of the term, a health law, but is an illegal interference with the rights of individuals, both employers and employés, to make contracts regarding labor upon such terms as they may think best, or which they may agree upon with the other parties to such contracts. Statutes of the nature of that under review, limiting the hours in which grown and intelligent men may labor to earn their living, are mere meddlesome interferences with the rights of the individual, and they are not saved from condemnation by the claim that they are passed in the exercise of the police power and upon the subject of health of the individual whose rights are interfered with, unless there be some fair ground, reasonable in and of itself, to say that there is material danger to the public health or to the health of the employés, if the hours of labor are not curtailed. If this be not clearly the case, the individuals, whose rights are thus made the subject of legislative interference, are under the protection of the federal Constitution regarding their liberty of contract as well as of person; and the Legislature of the state has no power to limit their right as proposed in this statute. All that it could properly do has been done by it with regard to the conduct of bakeries, as provided for in the other sections of the act, above set forth. These several sections provide for the inspection of the premises where the bakery is carried on, with regard to furnishing proper washrooms and water-closets, apart from the bakeroom, also with regard to providing proper drainage, plumbing, and painting. The sections, in addition, provide for the height of the ceiling, the cementing or tiling of floors, where necessary in the opinion of the factory inspector, and for other things of that nature. Alterations are also provided for, and are to be made where necessary in the opinion of the inspector, in order to comply with the provisions of the statute. These various sections may be wise and valid regulations, and they certainly go to the full extent of providing for the cleanliness and the healthiness, so far as possible, of the quarters in which bakeries are to be conducted. Adding to all these requirements a prohibition to enter into any contract of labor in a bakery for more than a certain number of hours a week is, in our judgment, so wholly beside the matter of a proper, reasonable, and fair provision as to run counter to that liberty of person and of free contract provided for in the federal Constitution." 198 U. S. at pages 59–62, 25 Sup. Ct. at pages 544, 545 [49 L. Ed. 937, 3 Ann. Cas. 1133]; Bessette v. People, 193 Ill. 334, 62 N. E. 215, 56 L. R. A. 558.

The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statute when put into operation, and not from its proclaimed purpose. Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862, 34 L. Ed. 455; 3 Interst. Com. R. 185; Brimmer v. Rebman, 138 U. S. 78, 11 Sup. Ct. 213, 34 L. Ed. 862; 3 Interst. Com. R. 485; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064,

30 L. Ed. 220; State ex rel. Ritchey v. Smith, 42 Wash. 237, 247, 84 Pac. 851, 5 L. R. A. (N. S.) 674, 114 Am. St. Rep. 114, 7 Ann. Cas. 577; Butchers' Union, etc., Co. v. Crescent City Live Stock, etc., Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585; Dent v. West Virginia, 129 U. S. 114, 121, 122, 9 Sup. Ct. 231, 233 (32 L. Ed. 623). In the latter case it is said:

"It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken." Lochner v. New York, 198 U. S. 45, 53, 25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133; Jones v. Leslie, 61 Wash. 107, 110, 112 Pac. 81, 48 L. R. A. (N. S.) 893, Ann. Cas. 1912B, 1158; Adair v. U. S., 208 U. S. 161, 172, 28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764; In re O'Neil, 41 Wash. 174, 184, 83 Pac. 104, 3 L. R. A. (N. S.) 558, 6 Ann. Cas. 869.

In Little v. Tanner (D. C.) 208 Fed. 605, 609, the court, in using the language quoted in the majority opinion:

"It is plainly manifest that no merchant could afford to pay the sum of $6,000 annually for the mere privilege of giving away trading stamps or allowing discounts on his cash sales. But if this were the only objection to the act it may be that the courts would be powerless to enjoin its execution

—did not intend to concede that a lawful business could be prohibited by the Legislature, for the holding is directly to the contrary. The sense in which the language quoted is used is shown by the sentences immediately preceding and following the quotation:

"The court is fully satisfied from a bare inspection of the act, without more, and without considering the affidavits on file, that it is and was intended to be prohibitive of the business methods against which it is directed. * * * The power of taxation rests upon necessity, and is inherent in every independent state. It is as extensive as the range of subjects over which the government extends; it is absolute and unlimited, in the absence of constitutional limitations and restraints, and carries with it the power to embarrass and destroy."

That the holding of the court was that a lawful and beneficial business could not be prohibited by an act of the Legislature is shown by the following from that opinion:

"Is there any just basis for the classification here attempted? We discover none. The legality of what is generally known as the trading stamp business has been very generally affirmed by the courts." 208 Fed. at page 610.

The effect of this decision is that, the state itself, through its courts, having held the trading stamp business lawful, it was not necessary for the federal court in such a cause to reinvestigate that question; that its legality would be taken for granted, where the Legislature had sought to prohibit it; and that, it being certain that such a lawful business may not be directly prohibited, it cannot be accomplished indirectly under color of a revenue measure.

In State v. Moore, 113 N. C. 697, 707, 18 S. E. 342, 346, 22 L. R. A. 472, 475, it was said:

"The general scope and tendency of the act, in connection with the exaction of the very large license fee, induce us to believe that, viewed as a police regulation, it is so far restrictive and prohibitory as to contravene those fundamental principles we have enunciated, and which are intended to protect the citizen in the pursuit of an occupation not inherently dangerous or harmful to the public. It may be regulated, but it cannot be indirectly prohibited, by an exercise of the police power."

There is more reason for holding the law valid prohibiting the use of trading stamps than the law in the present case, for, while there is no element in the employment agency business itself which can be said to have within it a wrongful tendency, yet in the case of the trading stamps, given away by merchants with purchases, it may plausibly be contended there is present in the scheme itself that condition that encourages the members of the buying public to believe that they are "getting something for nothing," which is itself the dangerous element in all gambling. The act in question cannot be brought by analogy within the familiar cases regarding intoxicating liquors, oleomargarine, minors working at certain employments, limiting the hours of work by women, women working in saloons, minors entering poolrooms, maintenance of race tracks, contracts with minors, trading stamps and the like.

It will be noted that the initiative measure does not denounce the employment agency business as harmful, but simply declares:

"That the system of collecting fees from the workers for furnishing them with employment, or with information leading thereto, results frequently in their becoming the victims of imposition and extortion." People v. Warden, 157 N. Y. 116, 51 N. E. 1006, 43 L. R. A. 264, 268, 271, 68 Am. St. Rep. 763.

It is true that very few cases are found where the highest court of the land has declared a law enacted by a state under color of its police power unconstitutional; but this cannot be considered an argument, for occasions where Legislatures have overlooked the fact that their function is to render more secure men in their lawful callings, and not to deny them the right to engage therein, are scarcer still than such decisions.

It is said in the majority opinion that the state is qualified to legislate concerning local conditions, but the right of the laborer to work, to sell his labor for bread, and to hire some one to find him a place to work and to sell it, smacks more of fundamental and primary principles than of local or temporary conditions. Misfortune and dishonesty are of neither time nor place. Primarily the Legislature is the judge of such conditions, but its act will not stand where it is palpably in excess of the legislative power.

To disregard concrete examples of the effect or scope of a ruling or holding, if extended to other instances under like conditions, is to leave one in the realm of pure abstraction to find the right and wrong. Great care is necessary to avoid the danger of arguing from analogy, but it is as necessary to look forward to determine the possible effect of a ruling or holding as it is to look back along the line of precedents, in order to determine whether we are keeping within proper bounds.

The only thing that prevents case law becoming a wilderness of single instances is the fact that, given the same essential elements and reasons, the same rule will apply and result.

This law goes beyond what is reasonable in a remedy when it goes beyond the disease and deprives the patient of life. If the individual grocer defrauds his customers, by his weights or otherwise, no one would contend that the business of the grocer should be prohibited. If this law may be upheld, it is not perceived why some other equally well-meaning Legislature or electorate might not, with better reason, upon recital that the negro was in certain respects inferior to the white race, and was liable to be imposed upon by the dishonest white man, forbid all contracts between negroes and white men.

If this act be valid, may not one be that recites that upon frequent occasions labor leaders have exploited the members of their organizations for their own benefit, and that therefore all labor organizations should be prohibited—even while every one concedes the essential benefits which result from them, when honestly conducted? It would follow that an act was likewise valid which recited that frequently newspapers have become agencies for foisting upon the public worthless nostrums, and that therefore all newspapers should be prohibited, because of the wrongful manner in which certain ones were conducted.

To say that this is a far-fetched illustration, and that nothing of the kind is likely to happen under our system, is to beg, or rather confess, the point. The argument that the press, because it is a great engine in forming public opinion, will always be able to afford its own protection, defeats itself, for the position to be maintained is that the majority, upon consideration, should control.

But the rightful exercise of this power rests upon consideration, the weighing of the right and wrong by the majority, and by each individual of the majority. The strength of the press is in propaganda. The merchant or agent is one; his customers are many. If his customers are dissatisfied, and his right depend upon relative strength in a propaganda, his protest is drowned by the clamor of the many in opposition to him. So this argument would affirm that rights should be protected by the volume of appeal to the majority, and not by the righteousness of any consideration of such majority.

Courts will disregard the plea that a legislative act is an arbitrary and unreasonable exercise of power, where it is merely shown that one of equal, though of less conspicuous, guilt is let go free, while such other is condemned. Such plea is one of evasion, and not of justification. It is a prayer, not for the equal protection of the law, but for an equal license or indulgence under the law. It may be easier and simpler to prohibit a business than regulate or prohibit wrong conduct in it; but where neither public health, safety, nor morals are concerned, for doubtful convenience sake in such case to say "Thou shalt not," alike to right and wrong, to the wicked and the just, is to fail in the assertion of that for which laws and government were borne.

For the foregoing reasons I dissent.