The State appealed.
This is an indictment for the violation of chapter 75, Laws 1891, and it is found in the special verdict that the defendant, "without having first procured a license therefor from the Treasurer of the State of North Carolina, did hire six laborers in the county of New Hanover, in the State aforesaid, to be employed beyond the limits of the said State, and did solicit other laborers in said county to hire themselves to be so employed; and that the said defendant, on the (699) day aforesaid and in the county aforesaid, was engaged in the business of hiring in the said county laborers to be employed beyond the limits of said State; and that the said county of New Hanover is east of the line as at present established, and as so established on 6 February, 1891, for the receiving of patients by the North Carolina Insane Asylum."
The act referred to excludes, in express terms, from its operation any of the counties in the State which are west of the said line, except a few which are therein specifically named; and thus it appears that the same occupation may be lawfully and freely pursued in many of the counties of North Carolina, while in others a license fee of $1,000 is required to be paid into the State treasury; and its pursuit, without such a license, is denounced as a criminal offense and punishable by a fine of "not less than $500 and not more than $5,000," or by imprisonment in the county jail "not less than four months, or confinement in the State prison at hard labor not exceeding two years, for each and every offense, within the discretion of the court."
It must be manifest from these provisions that the principle of uniformity is entirely disregarded, and that, if the act is to be considered as an exercise of the taxing power of the Legislature, it must, under the repeated decisions of this Court, be declared unconstitutional and void.
The Constitution, Article V, section 3, authorizes the Legislature to tax "trades, professions, franchises," etc., and, although it is not expressly provided that such taxes shall be uniform, "Yet," says Rodman,J., *Page 512 
speaking for the Court in Gatlin v. Tarboro, 78 N.C. 119, "a tax not uniform, as properly understood, would be so inconsistent with natural justice and with the intent which is apparent in the section of the Constitution above cited, that it would be restricted as unconstitutional."
In Worth v. R. R., 89 N.C. 291, the principle just stated was (700) distinctly recognized and declared to be within the spirit and meaning of the fundamental law. Smith, C. J., in delivering the opinion of the Court said: "We should be reluctant to hold, if there were no questions of constitutional right involved, that this method of levying taxes was sanctioned by our Constitution and consistent with the equality and uniformity which it contemplates. The `uniform rule' to be observed in the exercise of the taxing power seems so far applicable to the taxes imposed on trades, professions, etc., as to require that no discriminating tax be imposed upon persons pursuing the same vocation, while varying amounts may be assessed upon vocations or employments of different kinds." Again in Puett v. Commissioners, 94 N.C. 709, it was said: "The principle of uniformity pervades the fundamental law, and, while not in the Constitution applied in express terms to the tax on trades, professions, etc., necessarily underlies the power of imposing such a tax." In this last case the Court adopted the words ofMiller, J., in the Railroad Tax Cases, 92 U.S. 575: "That, while one tax may be imposed upon innkeepers, another upon ferries, and a still different tax on railroads, the taxation must be the same on each class — that is, the same tax upon all innkeepers, upon all ferries and upon all railroads, in their respective classes as taxable subjects." And again, inS. v. Powell, 100 N.C. 525, the same language was accepted as a correct definition of "uniformity," and it was repeated "that uniformity, in its legal and proper sense, is inseparably incident to the power of taxation."
The act under consideration, if intended to impose a tax in the legal significance of the term, very plainly falls within the inhibition of the organic law as interpreted so often by this Court, for it cannot, with the least show of reason, be contended that the principle of uniformity is not violated when the same occupation is heavily taxed in one county, while in an adjoining county it is entirely free and untrammeled. (701) It is too plain for argument that, if the Legislature had passed an act imposing a tax upon merchants doing business in the counties of New Hanover, Pender and Bladen, while like merchants in the counties of Brunswick, Robeson and Richmond were not required to pay such tax, the act would be void. And yet such a discrimination in taxation would be no greater than that which is attempted to be made under the statute in question.
It is not very unusual in this country for the State, either directly or through its various municipal corporations, to require the payment of a *Page 513 
certain amount for the privilege of prosecuting one's profession or calling, and this is required indiscriminately of all kinds of occupations, whatever be their character, whether harmful or innocent, whether the license is necessary to the protection of the public or not. "While the courts are not uniform in the presentation of the grounds upon which the general requirement of a license for all kinds of employments may be justified, on one ground or another, the right to impose the license has been very generally recognized. Whatever refinements of reasoning may be indulged in, there are but two substantial phases to the imposition of a license tax on professions and occupations. It is either a license, strictly so called, imposed in the exercise of the ordinary police power of the State, or it is a tax laid in the exercise of the power of taxation." Tiedeman Lim. of Po., p. 101; Cooley Taxation, 403. We have seen that under the latter view the law under consideration cannot be sustained for the want of the uniformity required by the Constitution, and this brings us to the other branch of the inquiry, whether it can be upheld as a regulation under the police power of the State.
2. "The police of a State, in a comprehensive sense, embraces its whole system of internal regulation, by which the State seeks not only to preserve the public order and to prevent offenses against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are (702) calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as is reasonably consistent with a like enjoyment of rights by others." Cooley Const. Lim., 704. "The power is very broad and comprehensive, and is exercised to promote the health, comfort, safety and welfare of society. Its exercise in extreme cases is frequently justified by the maxim, salus populi supremalex est. It is used to regulate the use of property by enforcing the maxim, sic utere tuo ut alienum non loedas, and under it the conduct of an individual and the use of property may be regulated so as to interfere to some extent with the freedom of the one and the enjoyment of the other." In re Jacobs, 98 N.Y. 198; Tiedeman, supra, 1. This power, under our Federal system of government, has been left with the States, and "the only limits to its exercise in the enactment of laws by their Legislatures is that they shall not prove repugnant to the fundamental law, the State Constitution and the Federal Constitution, with the laws made under its delegated powers." S. v. Moore, 104 N.C. 714; Cooley Const. Lim., 574. In its fair and reasonable exercise the Legislature, by reason of the very nature of the power, is not restricted by constitutional provisions in reference to uniformity as, says Judge Cooley, "the circumstances of a particular locality, or the prevailing public sentiment in that section of the State may require or make acceptable different *Page 514 
police regulations from those demanded in another. These discriminations are made constantly, and the fact that the laws are of local or special operation only is not supposed to render them obnoxious in principle." Cooley, supra, 480.
This principle has been fully recognized in this State, and is illustrated by many decisions. In Intendant v. Sorrel, 46 N.C. 49, an ordinance of the city of Raleigh requiring, under penalty, oats to be weighed by the public weighmaster, before being offered for sale, was (703) sustained as a valid police regulation. So, an ordinance forbidding the sale of fresh meat in the town of Durham except at the market-house (S. v. Pendergrass, 106 N.C. 664), and an act regulating the sale of seed-cotton in certain counties of the State, were held to be a proper exercise of the police power. So, also, it may be stated, as a general principle, that all callings and professions, which, by reason of their peculiar character, may, directly or indirectly, do harm to the public, are subject to police regulations, and a license may be required for their prosecution. On this principle, says Tiedeman, supra, 101, "attorneys, physicians, druggists, engineers and other skilled workmen may be required to procure a license, which would certify to their fitness to pursue their respective callings, in which professional skill is most necessary and in which the ignorance of the practitioner is likely to be productive of great harm to the public and to individuals coming into business relations with them. So, also, the licensing of dramshops, green-grocers, hackmen and the like, is justifiable, in order that these callings may be effectually brought within the police supervision, which is necessary to prevent the occupation becoming harmful to the public." It must not be understood, however, that the exercise of the police power is without limit. On the contrary, it is settled, by abundant authority, that, while it is for the Legislature to determine what regulations are needed to protect the public health and secure public comfort and safety, and its measures calculated and intended to accomplish these ends are generally within its discretion, and not the subject of judicial review, it is nevertheless true that this extensive authority must be exercised in subordination to those great principles of fundamental law which are designed for the protection of the liberty and the property of the citizen. "Liberty, in its broad sense, as understood in this country, means the right not only of freedom from actual servitude, imprisonment or (704) restraint, but the right of one to use his faculties in all lawful ways, to live and to work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or vocation." In re Jacobs,supra; People v. Gillson, 109 N.Y. 389.
In Butcher's Union Co. v. Crescent City Co., 111 U.S. 746, Mr. JusticeField said: "That among the inalienable rights, as proclaimed *Page 515 
in the Declaration of Independence, is the right of men to pursue any lawful business or vocation in any manner not inconsistent with the equal rights of other. . . . The right to pursue them without let or hindrance, except that which is applied to all persons of the same age, sex and conditions, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright." In the same case Mr. Justice Bradley said: "I hold that the liberty of pursuit, the right to follow any of the ordinary callings of life, is one of the privileges of a citizen of which he cannot be deprived, without invading his right to liberty within the meaning of the Constitution." In Berthief v. O'Riley, 74 N.Y. 509, Andrew, J., remarked, that a man's right to liberty includes "the right to exercise his faculties and to follow a lawful vocation for the support of life." Judge Cooley
says, "The general rule undoubtedly is, that any person is at liberty to pursue any lawful calling, and to do so in his own way, not encroaching on the rights of others. It is not competent, therefore, to forbid any person, or class of persons, whether citizens or resident aliens, offering their services in lawful business, or to subject others to penalties for employing them."
These authorities are referred to for the purpose of showing that under the mere guise of a police regulation a person cannot be unduly restricted or substantially prohibited from pursuing a lawful occupation. In order to justify such legislation, the business must itself be of such a nature that its prosecution will do damage to the public, whatever may be the character and qualification of those who engage in it. Mr. Tiedeman, in his very reliable work (supra, 290), remarks: "In (705) order to prohibit the prosecution of a trade altogether, the injury to the public, which furnishes the justification for such a law, must proceed from the inherent character of the business. . . . But if the business is not inherently harmful, the prosecution of it cannot rightfully be prohibited to one who will conduct the business in a proper and circumspect manner. Such an one would be `deprived of his liberty' without due process of law." It is on the ground of their inherently harmful and dangerous character that the keeping of gaming tables, or the selling of intoxicating liquor or other things of a demoralizing nature may be absolutely prohibited. Mugler v. Kansas, 123 U.S. 623; S. v.Joyner, 81 N.C. 534. This may be and is often directly accomplished by legislation, which, in its terms, is expressly prohibitory, instead of the circuitous method of imposing a burden, in the nature of a license as a police regulation, which is difficult or impossible to be borne, and which, in the end, may make the occupation unprofitable. Cooley Taxation, 404. *Page 516 
It must be apparent, from an examination of the statute in question, that the occupation of an "emigrant agent," as defined therein, does not belong to that class which is so inherently harmful or dangerous to the public that it may, either directly or indirectly, be restricted or prohibited. The statute defines the said occupation "to mean any person engaged in hiring laborers in this State to be employed beyond the limits of the same." It cannot be seriously contended that a laborer, under our system of government, as indicated by the unquestionable authorities to which we have referred, does not possess the right of hiring his services to any one, either within or without the State. And if he may do this, we are unable to see, as we have just remarked, how an agent or other person engaged in hiring him to be employed without the State can be considered as following an occupation which, in itself, is (706) inherently dangerous or harmful in the sense above mentioned. Indeed, this position is fully conceded by the Attorney-General, and we will now consider whether the license imposed by the act is restrictive or prohibitory in its character.
While the probable harm and inconvenience of immigration to the public may not be averted by such legislation, it is of the greatest importance to all of the citizens of the State that the inexperienced and artless laborer may not be imposed upon by the false representations and other fraudulent practices of an emigrant agent, and it is one of the highest duties imposed upon the lawmakers to prevent such abuses by prescribing rigid and appropriate regulations under which the said occupation can alone be followed. Regulations of this nature may be made in a variety of ways, but that which is most commonly adopted is the requirement of a license fee which is exacted for the purpose of defraying the probable expenses of ascertaining the moral and other qualifications of the proposed licensee, and the proper inspection or other necessary police supervision under which the particular business is to be conducted. While the means adopted must have a relation to the accomplishment of these ends, it is not absolutely necessary in all cases that the law or ordinance imposing the license should prescribe any specific regulation, and it is sufficient if the court can see that the fee exacted is a reasonable proportion of the necessary expenses incident to the general police supervision. The entire absence, however, of any regulation, or of any police supervision whatever, is a powerful aid (and especially where the amount exacted is very large) in determining whether the license is not really a disguised species of taxation or an indirect method of unduly restricting or prohibiting the business altogether, In this case, however, we have no hesitation in reaching the conclusion that the act in question is not and was not intended as a mere regulation, but its object was either to tax or to restrict or prohibit the *Page 517 
particular occupation mentioned therein. This is evident from (707) the fact that it does not contain any of the features of a police regulation, nor is it connected in any way with any police supervision, No provision whatever is made for the ascertainment of the moral character or other qualities of the applicant. The statute provides that "any person shall be entitled to a license" upon the payment of the prescribed fee, and therefore the vilest imposter may demand a license and the State Treasurer has no discretion to withhold it. Neither are there any regulations as to the manner in which the business is to be carried on, and the licensee is left entirely unrestrained, except so far as he may be amenable to the general law. Even if there were such regulations, there is an utter absence of any provision for an inspector or other officer whose duty it is to enforce them. The general scope and tendency of the act, in connection with the exaction of the very large license fee, induce us to believe that, viewed as a police regulation, it is so far restrictive and prohibitory as to contravene those fundamental principles we have enunciated, and which are intended to protect the citizen in the pursuit of an occupation not inherently dangerous or harmful to the public. It may be regulated, but it cannot be indirectly prohibited by an exercise of the police power. Whatever doubt, however, that may possibly remain as to the validity of the act as a police regulation may be dissipated when we consider the reasonableness of the amount required for the license. We have already adverted to this principle and will refer to some of the many authorities upon the subject. In Cooley Taxation, 408, it is said: "Where the grant is not made for revenue, but for regulation, a much narrower construction is to be applied. A fee for the license may be exacted, but it must be such a fee only as will legitimately assist in the regulation, and it should not exceed the necessary or probable expense of issuing the license and of inspecting and regulating the business which it covers." (708)
In Tiedeman (supra, 274) it is said that, "In the regulation of occupations it is constitutional to require those who apply for a license to pay a reasonable sum to defray the expenses of issuing the license and maintaining the police supervision." The principle has been emphatically recognized by this Court in S. v. Bean, 91 N.C. 554. In that case it appeared that the town of Salisbury had, under its charter, the authority to regulate the manner in which provisions might be sold in its "streets and markets," and to enforce such regulations by appropriate penalties, etc. The ordinance provided that "No butcher or other person shall cut up and expose to sale any fresh meats within the limits of Salisbury without first obtaining a license from the commissioners of the town, which license shall authorize the person or persons to sell meat at a certain stand, shop or stall specified in said license, to *Page 518 
be used as a market, and for which license said person shall pay the sum of $3 per month, payable in advance." The Court held that, as the subjects of taxation were enumerated in the charter, and as the occupation of selling meat by butchers was not included therein, the town had no right to impose a tax upon that particular occupation; and when it was urged that the license fee could be sustained as a regulation under the police power, it was held that it was not a police regulation, but a tax. The opinion was based upon the unreasonableness of the amount required for the license. The Court (Ashe, J.) said: "There are authorities to be found to the effect that, under the police power, license may be granted for the exercise of particular avocations and employments, but in all such cases it is held that the fee or price exacted for the privilege must not be with a view to revenue; and in such cases it is competent and proper for the courts, where the effect and purpose of an ordinance are brought to be reviewed by them, to see that the fee or price paid for the privilege of (709) exercising the franchise is reasonable and not for the purpose of raising revenue. Desty on Taxation, 306, and to the like effect is S. v. Mayor, etc., 23 N. J., 280." The Court then proceeded to quote Dillon on Municipal Corporations, 357, to the effect that, in the case of a license under the police power, only "a reasonable fee for the license and the labor attending its issue may be charged." Several cases were cited to show that, because of the unreasonable amount exacted for a license, its imposition was considered as an exercise of the taxing and not of the police power. The authorities are abundant in support of the proposition, but its correctness is so fully established that it is hardly necessary to reproduce them in this opinion. We will refer, however, by way of further illustration, to the instructive case of St. Paul v.Trager, 25 Minn. 248. The city of St. Paul had, by ordinance, required a license fee of $25 for every huckster of vegetables who plied his trade in the streets of the city. In determining whether this was a license or a tax, the Court, in the course of the discussion, said: "It cannot be claimed that it was enacted in the exercise of any police power for sanitary purposes, or for the preservation of good order, peace or quiet of the city, because, neither upon its face nor upon any evidence before us, does it appear that any provision is made for inspection, etc. . . . The annual sum exacted for the license is manifestly much in excess of what is necessary or reasonable to cover expenses incident to its issue. . . . No regulations being prescribed in reference to its prosecution under the license, there could be little, if any, occasion for the exercise of any police authority in supervising the business or enforcing the ordinance, and no cause for any considerable expense on that account." The Court held that the ordinance was not a *Page 519 
police regulation. Inasmuch as a license fee must be prescribed in advance, and in many instances it cannot be determined with accuracy what the expenses incident to the regulation may be, the courts are not inclined to be too exact in placing an estimate upon them so long as the sum demanded is not altogether unreasonable. But we (710) have no difficulty in holding in the present case that the amount of $1,000, to be paid in each county in which the occupation is pursued, is enormously in excess of the probable expenses incident to the regulation. We have seen that, in fact, there is no regulation at all, and, therefore, no expense, except the insignificant amount necessary to defray the cost of simply issuing a license. If a license fee of three dollars per month was held excessive in S. v. Bean, supra, where very many of the elements of a police regulation were present, what shall we say of the license fee of $1,000 in this case, in which there is virtually no expense, and where there is not a single feature which indicates any police regulation whatever.
As the questions discussed are of much importance, and especially, because they involve the constitutionality of an act of the Legislature, we have been somewhat elaborate in the expression of our views. Entirely mindful of that most salutary principle, that no court should declare an act of the Legislature unconstitutional, unless it is plainly so, and deeply conscious as we are of the profound responsibility imposed upon those whose province it is to exercise so delicate a duty, we cannot hesitate in deciding that the act under examination is incapable of being sustained in any point of view.
Considered as a tax (and this we think is its true character), it is void for want of uniformity; and considered as an exercise of the police power, it is likewise void, because of its restrictive or prohibitory character, as well as the unreasonable amount exacted as a license fee.
Affirmed.
Cited: Crinkley v. Egerton, ante, 449; S. v. Warren, ante, 685; S. v.Carter, 129 N.C. 561; S. v. Hunt, ib., 689, 690, 691; Brooks v. Tripp,135 N.C. 160; Carr v. Comrs., 136 N.C. 126; S. v. Roberson, ib., 589;Lane v. Comrs., 139 N.C. 445; S. v. Williams, 146 N.C. 628; St. Georgev. Hardie, 147 N.C. 97; Dalton v. Brown, 159 N.C. 182; S. v. Snipes,161 N.C. 245; S. v. Darnell, 166 N.C. 304. *Page 520 
(711)