EDWARDS & BROWNE COAL COMPANY et al., Appellants, v. CITY OF SIOUX CITY et al., Appellees.

No. 40941.

FEBRUARY 9, 1932.

Hays, Baron & Mathews and Fribourg & Slotsky, for appellants.

R. A. Oliver, A. O. Jepson and J. E. Marshall, for appellees.

Parrish, Cohen, Guthrie & Watters, Amici Curiae.

GRIMM, J.—The plaintiffs are individuals, firms, and corporations, nine in number, who, for many years, have been engaged in keeping for sale, in Sioux City, petroleum products, including gasoline, kerosene and fuel oil. The parties own various filling stations for the retail sale of said products and various bulk storage tanks for the storage of such products.

The defendant city is a municipal corporation of the first class, operating under the commission form of government. The other defendants are members of the city council and certain city employees.

On or about August 1, 1930, the said city enacted an ordinance designated as "an ordinance regulating the keeping for sale of inflammable oils, licensing oil magazines and prescribing penalties for violation thereof," consisting of 16 sections. The following sections are the ones material and in controversy in this case:

"Section 1. License Required. It shall be unlawful to establish or use in the City of Sioux City, Iowa, a magazine or magazines for the storing of inflammable oils, kept for sale, commonly called a storage tank, a filling station or a curb pump, without having first procured the license and having paid the license fee hereinafter provided."

Section 2 refers to applications for license. Section 3 creates a committee of safety, made up of the Commissioner of Public Safety, the Chief of the Fire Department, and the City

Building Inspector. Section 4 has to do with the duties and powers of the Committee of Safety, in the following terms:

"(a). To inspect and examine such magazines and tanks and the structures, valves, pipes and accessories situated on the premises therewith or appurtenant thereto and any street or public or private improvement abutting on or connected with such premises, for the purpose of requiring compliance with law and with city ordinances relative thereto, and in the operation thereof, and in order that the same or any portion thereof shall not become or remain hazardous or dangerous in any respect. Such inspections shall be made as frequently as the committee may deem advisable.

"(b) To pass upon and approve all applications, for the license of magazines when such magazines and the other things referred to in subsection (a) of this section, conform to law, city ordinances now or hereafter in effect, and the provisions hereof, which approval shall be noted upon the application by the chairman.

"(c) To inspect the operation of such magazines, appurtenances and premises for the purpose of preventing the doing of anything thereon in violation of law or city ordinance."

"Section 5. Authority. The members of said committee of safety and their duly authorized assistants and members of the city police department and fire department, in the performance of duty, are hereby given authority to enter any portion of such premises for the purpose of inspecting the same, and to inspect any portion thereof. The members of said committee of safety may make or order such tests as they may from time to time deem advisable in the performance of their duties hereunder, and from time to time require such repairs, additions, alterations or changes in such magazines, appurtenances and premises and the manner of using and operating the same, as may be necessary to secure compliance with the provisions of this or any other ordinance of the City of Sioux City, or any law."

Section 6 provides for an appeal from the committee of safety to the city council. Section 7 designates the method of appeal. Section 8 provides for the procedure upon appeal. Section 9 provides that, on the approval of the application and payment of license fees, the licenses shall be issued. Section 10 pro-

vides for suspensions and revocation of licenses. Section 11 is designated "License fees." Section 12 is as follows:

"The provisions of this ordinance shall apply to all such inflammable oil magazines now in use or hereafter constructed. Provided, however, that when any such magazine shall be hereafter constructed, the license need not be secured until such magazine is ready for use."

"Section 13. Regulations. All such magazines, and the structures, valves, pipes and accessories situated on the premises therewith or appurtenant thereto, together with public or private improvements connected with such premises must be kept and operated in compliance with law, the building code, and other city ordinances, and in a safe and proper manner, and the same shall not be permitted to become or remain defective, hazardous or dangerous."

"Section 14. Penalties. Any person violating or failing to comply with any of the provisions of this ordinance, shall upon conviction, be fined in any sum not exceeding $100.00 or imprisoned for a term not exceeding thirty days; and each day that any person shall continue to violate or fail to comply with any of the provisions of this ordinance, shall be considered a separate offense."

Section 15 repeals conflicting ordinances. Section 16 provides for the taking effect of the ordinance on publication, etc.

It appears from the record that the plaintiffs own and operate about 80 retail filling stations and 9 bulk storage plants in Sioux City. It also appears that there are about 210 filling stations operated in Sioux City. The amounts of the fees will be hereinafter dealt with.

The appellants advance 22 different propositions of law in their attack upon the ordinance. Their contentions, however, may be summarized under 3 distinct heads, as follows:

1. The ordinance in question is not a valid exercise of the police power, but is intended as and is an unauthorized tax measure, because the amount of revenue produced thereby is greatly in excess of the legal amount required for its administration and enforcement. It is claimed that the ordinance attempts to assert two forms of police power, to wit, regulation and licensing, but is not prohibitory. It is claimed that the regula-

tory provisions are not enforceable and that the amount of revenue greatly exceeds the cost of issuing license. It is claimed that the regulatory provisions are not enforceable because, first, they do not provide any specific rules of action, and, second, their violations are punishable by heavy fines, and they are too vague and indefinite to be enforceable statutes. It is further contended that, even assuming that the regulatory provisions of the ordinance were valid, the amount of revenue greatly exceeds the cost of enforcing the same.

2. The ordinance in question violates Section 1 of the 14th Amendment to the United States Constitution and Section 1, Article 1, of the Constitution of the State of Iowa, because the penal provisions thereof are so great as to deprive the person subject to the ordinance of due process of law and of equal protection of the laws.

3. The ordinance in question violates Section 1 of the 14th Amendment to the United States Constitution and Section 6, Article 1, of the Constitution of the State of Iowa, because it is expressly limited in its application to persons using a magazine of more than 120 gallons capacity for keeping inflammable oils for sale, and does not apply to persons using magazines for keeping inflammable oils not for sale, thereby creating an improper discrimination and depriving the person subject to such ordinance of the equal protection of the laws and depriving them of their property without due process of law.

In answer to all of the claims and arguments of the appellant, the appellee relies upon four propositions, as follows:

1. A municipal corporation has the power to license and regulate the business of storing, transporting and selling inflammable oils.

2. The burden is upon the objector to show that the license fee fixed by an ordinance is so high as to actually constitute a revenue measure under the guise of a license.

3. The penal provisions of the ordinance do not violate the Due Process or Equal Protection clause of the Constitution.

4. The classifications prescribed by the ordinance are not so unreasonable and arbitrary as to violate the Due Process or Equal Protection clause of the Constitution.

I. The appellees contend that the city has the power to enact and enforce the ordinance in question by reason of the

provisions of Sections 5714, 5745, and 5764 of the Code of 1931, reading as follows:

"5714. *Power to pass.* Municipal corporations shall have power to make and publish, from time to time, ordinances, not inconsistent with the laws of the state, for carrying into effect or discharging the powers and duties conferred by this title, and such as shall seem necessary and proper to provide for the safety, preserve the health, promote the prosperity, improve the morals, order, comfort, and convenience of such corporations and the inhabitants thereof, and to enforce obedience to such ordinances by fine not exceeding one hundred dollars, or by imprisonment not exceeding thirty days."

"5745. *Power to regulate, license, or prohibit.* They shall have power to limit the number of, regulate, license, or prohibit: * * * 6. Gasoline curb pumps in streets, highways, avenues, alleys and public places."

"5764. *Gunpowder—combustibles.* They shall have power to regulate the transportation and keeping of gunpowder, inflammable oils, or other combustibles, and to provide or license magazines for storing the same, and prohibit their location or maintenance within a given distance of the corporate limits of such cities or towns."

It will be noted that section 12 of the ordinance in question does not contemplate the lodging of any prohibitory power in the council. By the express terms of section 12, its provisions shall apply to all magazines in use at the time the ordinance was passed or thereafter constructed, and it also provides as to all magazines thereafter constructed that the license need not be secured until the magazine is ready for use. In other words, by the express terms of the ordinance, it is manifest that the city council was not endeavoring to exercise any right of prohibition, but rather only to deal with the structure after it is once constructed.

The appellant contends that by reason thereof, the ordinance under consideration is such that Marquis v. Waterloo, 210 Iowa 439, and Cecil v. Toenjes, 210 Iowa 407, are not applicable.

In the Marquis case, this court considered an ordinance establishing a restricted residence district, which ordinance expressly prohibited the construction of certain buildings within

said district. By the terms of the ordinance, the council was granted the definite power to prohibit the erection of the structures in controversy in the restricted area if, in the exercise of its discretion, it saw fit so to do. If it did not desire to prohibit, it might license. The element of location was involved, and, as will be hereinafter referred to, there is a definite distinction between ordinances involving matters of location and ordinances dealing with other matters, such as building construction details.

In the Cecil case, this court dealt with an ordinance also granting to the city the power to prohibit the structure in controversy. The pertinent language of the ordinance is as follows:

" 'Provided * * * that the issuing of or refusal of a permit to install or locate such tanks (gasoline tanks) shall be within the sound discretion of the city council.' "

It will thus be noted that each of said cases dealt with the power of the city to grant a license or prohibit the erection of the structure. In the case at bar, the ordinance, by its terms, deals only with the structure as it has been put up. While section 1 provides that it shall be unlawful to maintain inflammable oil magazines without having first procured a license and having paid the license fee, nevertheless, by section 12, it very clearly appears that the ordinance applies only to the completed structure. This necessarily negatives any idea of prohibiting the erection of the structure. The only fair interpretation to be placed on the ordinance, as a whole, is that it is intended as one to apply to structures already erected. It is not in contemplation that the erection of the structure shall be prohibited, but rather that the tax shall be levied upon the structure. The ordinance, as a whole, contemplates that if the tax is not paid, or the ordinance otherwise complied with, then the owner or operator shall be punished as provided in section 14. Moreover, this case is clearly distinguishable on the facts from both the Marquis case and the Cecil case. In the Marquis case, the court had before it for consideration a zoning ordinance. As was said in the opinion:

"His (the plaintiff's) application for a permit to install underground storage tanks, and to erect and maintain a gasoline filling station upon said property, was denied by action of

the city council, for the reason that the *location* of the proposed filling station is within one of the residential districts.'' (Writer's italics.)

This residential district had been fixed by an appropriate ordinance and such structures were prohibited.

In the *Cecil* case, the plaintiff desired to erect on a piece of property an automobile filling station. The ordinance provision is hereinbefore quoted. The fact of the situation in that case is unusual, as is disclosed by the following from the opinion:

''There is involved a peculiar street intersection. The traffic from five directions converges in front of appellant's property. Travel comes into this intersection on Fremont Street, from the north, on Maple Street, from the east, on Walnut, from the northeast and southwest, and on Fifth Street from the southeast. Across from appellant's property is the largest church auditorium in Waterloo. Running up Fifth Street, turning to the right on Walnut Street in front of said property, is a boulevard. That is the route followed by fire trucks on their trips to the east side of the city. Opposite the Methodist Church across Fremont Street is a school. Objection to the oil station was made by Grace Church, and the city fire department. Many pedestrians walk to and fro on the sidewalk which vehicles would necessarily cross, going to and from appellant's property, were an oil station located thereon. On Sundays and at other times when services are held, many cars park near Grace Church. Traffic on that intersection is especially heavy. Wherefore the intersection is congested. Also it is indicated by the evidence that danger exists because of the inflammable and combustible nature of the contemplated liquids. So, then, as shown by the record, to store said liquids in large quantities at that place would create an unusual hazard.''

Upon such a state of facts, under an ordinance granting power to prohibit, we have an entirely different situation from the one at bar. In each of the said two cases, the real question involved was one of location. The question of safe or proper construction was not involved. There was only involved the question whether any kind of a filling station, regardless of how it was constructed, regardless of its safety, and regardless of all other circumstances, should be located at the particular point in

question: the one in a restricted residential district, and the other at a peculiar five-point intersection, in the vicinity of the largest church in the city. Manifestly, no general rules or regulations can be prescribed by which the question of a proper *location* can be determined. In other words, each case must, upon that point, rest upon its own facts.

In the case at bar, we are not dealing with *location* at all. We are dealing rather with kinds of materials to be used in construction, general specifications of construction, and fire and general safety regulations.

▮ It is the contention of the appellant that because the ordinance fails to provide any proper or reasonable specifications, it is, as regards regulations, unenforceable and void. It will be noted that aside from section 13, hereinbefore quoted, no regulations are found in the ordinance. Nowhere are there any rules as to building materials, location of tanks or pumps, size or strength of tanks, whether the tanks are to be buried and how deep, kinds or size of pumps, pipes, vents, hose leads, or openings, or any specifications whatever. The ordinance merely provides that all these things must be kept and operated in accordance with law, the building code, and other city ordinances, and in a *safe and proper manner,* and the same *"shall not be permitted to become or remain defective, hazardous or dangerous."*

The building code is not included in the ordinance except by reference. Other city ordinances are not included in this ordinance except by reference. If the building code can be thus properly made a portion of the ordinance, manifestly the ordinance can be changed at any time by changing the building code. Still more troublesome, however, is the fact that this ordinance provides that these structures ''shall not be permitted to *become* and *remain defective, hazardous or dangerous.''* Manifestly, these are matters upon which persons might very well honestly differ. Whether a structure is ''defective, hazardous or dangerous'' would, in the city of Sioux City, if this ordinance should be held valid, be a matter of the opinion of the then enforcing officer or officers, whoever he or they might be.

Manifestly, general safety regulations, as distinguished from matters of *prohibition* and *location,* are required to lay down definite rules and specifications in order that, as to estab-

lished buildings, a rule of uniform security for the owner may exist, as well as safety for the public. Manifestly, this ordinance (unless for revenue purposes) is not for the purpose of prohibiting the construction of magazines or controlling their location. If this ordinance has any proper foundation at all, it must be solely for the purpose of controlling the *safety* of magazines and their appurtenant buildings, drives, and fittings. Such ordinances have been frequently under consideration by the courts. .

In Richmond v. Dudley, 129 Indiana, 112, 28 N. E. 312, 13 L. R. A. 587, the court had for consideration an ordinance providing a license for inflammable oil storage. The ordinance contained no specifications as to building fixtures or otherwise. In holding the ordinance void, the court said:

"The subject covered by the ordinance in question is clearly within the police power conferred by the charter upon the municipality. * * * The danger to be apprehended to life and property from the storing of inflammable or explosive substances in large quantities within the limits of a city is so great as to invite legislative control of the same by the city government. The principal question in this case is whether or not the ordinance in question is a valid exercise of that power. It will be observed that this ordinance does not establish any general rules for the storage of the substances proposed to be regulated, but reserves to itself, at regular meetings, the right to grant or refuse permission to keep and store such oils, dependent upon whether it at such time deems the location and buildings suitable for such purpose, and the person presenting the petition 'a proper person.' * * * The business of keeping, storing, and dealing in such oils is a legitimate business, and every citizen has an inherent right to engage in the business upon equal terms with any other citizen."

See Bills v. Goshen, 117 Ind. 221, 3 L. R. A. 261; Yick Wo v. Hopkins, 118 U. S. 356, 30 L. Ed. 220; Baltimore v. Radecke, 49 Md. 217; Barthet v. New Orleans, 24 Fed. Rep. 563; State v. Mahner, 9 So. Rep. (La.) 480; Newton v. Belger, 143 Mass. 598, 10 N. E. 464, 3 New Eng. Rep. 722; In re Frazee, 63 Mich. 396, 30 N. W. 72, 6 West. Rep. 140; Anderson v. Wellington, 40 Kan. 173; Chicago v. Trotter, (Ill.) 26 N. E. Rep. 359.

The court said further, in Richmond v. Dudley, supra:

"It seems from the foregoing authorities to be well established that municipal ordinances placing restrictions upon lawful conduct, or the lawful use of property, must, in order to be valid, specify the rules and conditions to be observed in such conduct or business; and must admit of the exercise of the privilege by all citizens alike, who will comply with such rules and conditions; and must not admit of the exercise, or of an opportunity for the exercise, of any arbitrary discrimination, by the municipal authorities, between citizens who will so comply."

In Hanover v. Atkins, 78 N. H. 308, 99 Atl. 293, that court considered an ordinance regulating the erection or use of buildings within certain portions of the city. The ordinance provided that no building should be erected "which shall more immediately expose the precinct to fire." The litigation arose over a blacksmith shop. The word "by-law," appearing in the opinion, has the force and effect of an ordinance. The court said:

"The only semblance of a regulation contained in the by-law is the prohibition of the use of a blacksmith shop 'which shall more immediately expose the precinct to destruction by fire.' This language was substantially adopted from the statute above quoted * * * which defined and limited the power of the commissioners in enacting by-laws to prevent an increase of the fire-risk arising from adjacent buildings. They were authorized to make reasonable rules and regulations to promote this general purpose of the legislature, not merely to adopt the statutory language in the form of a by-law and reserve to themselves in each individual case the power of deciding the question of the fire-risk, guided by no specific rule or law. * * * The commissioners were authorized to make regulations to effectuate the purpose of the act, as for instance, to provide the number of feet from other buildings the blacksmith shop should be located, or to prescribe some reasonable method in accordance with which the business could be carried on without materially increasing the danger from fire."

See also Yick Wo v. Hopkins, 118 U. S. 356, 30 L. Ed. 220,

6 Sup. Ct. 1064. In Kilgour v. Gratto, 224 Mass. 78, 112 N. E. 489, that court said:

"It (the ordinance) should afford some standard of conduct to the landowner so that he may know where to locate, how to design, construct, equip and otherwise prepare for use his proposed building, and some principle to direct the licensing board as to the exercise of its judgment and discretion in issuing or denying the permit."

Other cases of the same character might be cited.

Manifestly, the words found in section 13, "All such magazines, and the structures, valves, pipes and accessories situated on the premises therewith or appurtenant thereto, together with public or private improvements connected with such premises must be kept and operated in compliance with law, the building code, and other city ordinances, and in a safe and proper manner, and the same shall not be permitted to become or remain defective, hazardous or dangerous," are utterly lacking in specifications which would enable anyone to comply therewith. What is a "safe and proper manner," when applied to structures of this kind? When does a structure of this kind become "defective, hazardous or dangerous?" Who is to determine the answers to these questions, and by what yardstick of conduct is he to act? In the absence of any record on the subject, how is one to know, though right today, that he will be right tomorrow? How is the owner of property to know that, though his property may be right today, he will be right tomorrow, if a change in city administration or city inspector takes place?

Section 14 of the ordinance provides penalties for violation of any of the provisions of the ordinance. How is the property owner to know whether he is committing or about to commit a misdemeanor by violating the ordinance? The legislature has not specified the regulations, nor has the city council, in the exercise of the power conferred upon it. As was said in Kreulhaus v. Birmingham, 164 Ala. 623, 51 So. 297, 26 L. R. A. (N. S.) 492:

"The citizen must judge for himself, at the peril of becoming a violator of law if he makes a mistake, in a matter about which the courts are often not in accord. Such an ordinance is void."

1040

Provisions of ordinances regulating building and maintenance of property are not enforceable unless they are certain and specific. See State of Kansas v. Crawford, 177 Pac. (Kan.) 360, 2 A. L. R. 880. In that case, a statute provided that "all electrical wiring shall be in accordance with the national electrical code." The Supreme Court said:

"The clause * * * (quoting clause) * * * is void for uncertainty. * * * If the legislature desires to adopt a rule of the National Electrical Code as a law of this state, it should copy that rule."

Manifestly, the only purpose of requiring that the provisions of the electrical code be inaugurated into laws is that the law may be certain and specific. See also Elkhart v. Murray, 165 Ind. 304, 75 N. E. 593, 1 L. R. A. (N. S.) 940, in which the court held an ordinance requiring the use, on street cars, of fenders of a particular make or some "other fender equally as good," to be approved by the common council or its street committee, void because of the uncertainty of the standard required. See also the following cases: Newton v. Belger, 143 Mass. 598, 10 N. E. 464; Bizzel v. Goldsboro, 135 S. E. (N. C.) 50; Slaughter v. Post, 282 S. W. (Ky.) 1091; Com. v. Atlas, 138 N. E. (Mass.) 243; Montgomery v. West, 42 So. (Ala.) 1000; Keavey v. Randall, 122 Atl. (N. J.) 379.

The fact that this ordinance was passed without proper details and specifications is eloquent evidence that the ordinance was primarily passed as a revenue measure. We will deal with that subject later.

The ordinance is unenforceable and void because of the lack of sufficient rules and specifications.

■ II. As previously noted, by the terms of Section 14, any person violating or failing to comply with any of the provisions of the ordinance shall be convicted and fined, "and each day that any person shall continue to violate or fail to comply with any of the provisions of this ordinance, shall be considered a separate offense." It will thus be seen that if the property owner fails to keep his property "in a safe and proper manner" or permits it "to become defective, hazardous or dangerous," he is liable to punishment, and each day during which the said property remains unsafe, defective, hazardous, or dangerous

constitutes a separate offense, subject to a new fine. Appellant claims that on this account, this ordinance is void for uncertainty.

Bearing in mind that nowhere in the ordinance is there a specification as to how the whole or any part of the building or the machinery therein contained or the connections shall be constructed or maintained, how is anyone to know whether the building and its contents are being operated in a safe and proper manner or that they have become defective, hazardous or dangerous? Who is to determine these facts and by what yardstick shall the arbitrator decide them? It is the contention of the appellant that no yardstick has been furnished, and that the matter cannot be left to the whims and fancies of the party who may, for the time being, be the party in power.

Similar questions have frequently been before the courts of last resort of this country. In Connally v. General Construction Co., 269 U. S. 385, 70 L. Ed. 322, 46 Sup. Ct. 126, the Supreme Court of the United States passed upon a statute of Oklahoma, and held the same void for uncertainty in providing that a contractor shall pay his employees "not less than the current rate of per diem wages in the locality where the work is performed." The court quotes with approval from United States v. Capitol Traction Co., 34 App. Cas. (D. C.) 592, 19 Ann. Cas. 68, which latter case deals with a statute which makes it an offense for a street railway company in the District of Columbia to run an insufficient number of cars to accommodate persons desiring passage thereon, without crowding the same. The court, after noting that there is a total absence of definition of what shall constitute a crowded car, says:

" 'The dividing line between what is lawful and unlawful cannot be left to conjecture. The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of

such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another.' ''

In passing, it may be said that it is apparent that it would be much easier to determine when a street car is crowded than to determine when an oil station or its equipment is maintained in a ''safe and proper manner'' or is ''defective, hazardous or dangerous.'' There is nothing in the instant ordinance which would guide either the property owner or the enforcing officer.

In United States v. Cohen Grocery Co., 255 U. S. 81, 65 L. Ed. 516, 41 Sup. Ct. 298, 14 A. L. R. 1045, the Supreme Court of the U. S. had under consideration Section 4 of the Lever Act, dealing with rates or charges in dealing in or with any necessaries. The court held the section void, in the following language:

''The sole remaining inquiry, therefore, is the certainty or uncertainty of the text in question; that is, whether the words, 'That it is hereby made unlawful for any person wilfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries,' constituted a fixing by Congress of an ascertainable standard of guilt and are adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them. That they are not, we are of the opinion, so clearly results from their mere statements as to render elaboration on the subject wholly unnecessary. Observe that the section forbids no specific or definite act. It confines the subject-matter of the invesitgation which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee, and the result of which no one can foreshadow or adequately guard against.''

In Cook v. State, 59 N. E. (Ind.) 489, a statute made it an offense to haul, over turnpike and gravel roads, in certain specified weather, loads of more than 2000 pounds in narrow-tired wagons, or of more than 2500 pounds in broad-tired wagons. The court held the act void because of uncertainty because there was no standard of tire width fixed.

In State v. Clarke, 37 Atl. (Conn.) 975, 61 Am. S. R. 45, 39 L. R. A. 670, the Supreme Court of Connecticut had under

consideration an ordinance which prohibited and made a nuisance the erection or maintaining of any awning, "except the same be upon a suitable frame, and attached entirely to the building, which awning shall not, when extended, be less than 6 feet from the sidewalk." The court said:

"This term 'suitable,' as here used, seems altogether too vague and indefinite to serve as the basis of an ordinance so highly penal in its consequences as this one is."

See also Yu Cong Eng v. Trinidad, 271 U. S. 500, 70 L. Ed. 1059, 46 Sup. Ct. 619.

When urged to hold a certain act constitutional, the court said in the latter case:

"We are likely thus to trespass on the provision of the bill of rights that the accused is entitled to demand the nature and cause of the accusation against him, and to violate the principle that a statute which requires the doing of an act so indefinitely described that men must guess at its meaning, violates due process of law."

Many other cases might be cited. Upon the principle and the rule announced in the foregoing case, it is manifest that the ordinance in question as a penal ordinance is void for uncertainty and unenforceability.

III. It is urged by the appellant that the ordinance was passed as a taxing measure rather than a licensing or regulating measure. It is claimed that the ordinance is in fact a taxing measure, and not an exercise of the police power.

An examination of the record discloses that the idea of such an ordinance originated when it became evident that a large number of new filling stations was being built in the city. It appears that about 40 of them were built in the summer of 1930. The mayor was a witness on behalf of the defendant, and there testified, at great length, in reference to the alleged additional work cast upon the city employees by virtue of these numerous new oil stations. Manifestly, the city endeavored to make the oil stations pay for all this additional work, whether the added duties arose in the Police Department, Fire Department, or any or all other departments of the city. There was a showing of attempting to allocate to the oil companies the cost

to the city of the service rendered by its employees in connection with these stations. It appears without contradiction that shortly before the ordinance in question was enacted, a meeting was held between representatives of the various oil companies and the mayor and other representatives of the city. It was not a regular council meeting. In that conference, it appeared that there were deficits in certain funds of the city. The claim was being made that some extra work fell upon certain city departments by reason of the rapidly increasing number of oil stations being installed in the city, and in substance the representatives of the oil companies were given to understand that an ordinance was to be passed, by the terms of which they would be called upon to make up these deficits in the city funds. Notwithstanding the protests of the oil companies, through their representatives, that they alone should not be singled out to bear the brunt of the deficits in the city funds, the ordinance under consideration, as stated in the conference, was promptly passed. It seems quite significant that, as previously noted, the ordinance is made to apply only to buildings already constructed. That is to say, it applies to buildings which were constructed at the time the ordinance became effective, and as specified in section 12: ''Provided, however, that when any such magazine shall be hereafter constructed, the license need not be secured until such magazine is ready for use.'' Had the council seriously intended to pass and enforce this ordinance as an exercise of police power, would the ordinance have contained the quoted language, or would it rather have provided that the structure must be constructed in accordance with said rules and regulations before the permit would be granted? The fact that little or no attention appears to have been given to the subject of enforceability of regulations in the ordinance or regulations which would make the ordinance enforceable as a penal statute, very strongly supports the claim that the ordinance was intended and is in fact a taxing ordinance, rather than an exercise of the police power.

A large part of the trial was consumed with testimony having to do with expenses in the various departments of the city. There was an attempt on the part of the city to show an added expense to the several departments, by reason of the increased number of oil stations. It would unduly extend this opinion to

deal in detail with this evidence. Suffice it to say, we think it satisfactorily appears that the amount of revenue received from the ordinance is out of proportion to the added expense to the city by reason of these oil stations.

It appears that the plaintiffs and other concerns who paid licenses would pay into the city annually more than $6,000.00. Moreover, it appears that 139 filling stations paid this amount, while as a matter of fact there were in the city of Sioux City about 210 filling stations operating in February, 1931. If these stations paid in accordance with the payments made by other stations, the grand total would be approximately $7,500.00 per year.

The real purpose for which the ordinance was passed is not to be gathered from the name with which it is christened, but from the facts and circumstances surrounding its passage and the form of the ordinance, together with the conclusions which must follow therefrom. As was said in State v. Osborne, 171 Iowa 678:

"When, therefore, it is clearly evident that an act sought to be justified as an exercise of the police power is not, in fact, intended as a regulation, and that its real purpose—no matter what verbiage is employed to conceal it—is to raise revenue or to accomplish some ulterior effect not within the legitimate province of legislation, the courts will hold it to be unauthorized and void."

The intent with which the ordinance was passed was one of the vital issues in this controversy. The statements made in the conference hereinbefore referred to, the failure to incorporate in the ordinance definite specifications of building construction and oil station maintenance, the failure to provide a yardstick of measurement whereby the police power might be enforced, together with the amount of revenue provided by the ordinance, point to the conclusion that the council was passing an ordinance for revenue, with a thin police power veneer.

In Solberg v. Davenport, 211 Iowa 612, this court said:

"Where the amount imposed is substantially in excess of and out of proportion to the expense incurred, it is generally regarded as a revenue measure. State v. Osborne, 171 Iowa 678; City of Ottumwa v. Zekind, 95 Iowa 622. This is particularly

so where no provision for inspection or regulation is made by the act. Waters-Pierce Oil Co. v. Hot Springs, 85 Ark. 509 (109 S. W. 293); State v. Moore, 113 N. C. 697 (18 S. E. 342); Densmore v. Erie City, 7 Pa. Dist. 355. It is also a well-settled rule that the terminology used in the act is in no way controlling in determining this question as to whether it is a license or a tax. State v. Osborne, 171 Iowa 678; Keckevoet v. City of Dubuque, 158 Iowa 631; Star Trans. Co. v. City of Mason City, 195 Iowa 930, 1. c. 956; 37 Corpus Juris 170.''

It will be noted that the ordinance deals only with magazines where inflammable oils are *kept for sale*. The legislature has definitely placed a tax upon the *sale* of inflammable oils, as found in Chapter 251-A1 of the Code. Manifestly, the legislature did not intend the councils of the various cities to impose a double tax upon this industry. See Security Savings Bank v. Board of Review, 189 Iowa 463; Atlantic City v. Hemsley, 70 Atl. 322 (N. J.).

As the ordinance in question is an ordinance to levy taxes, it is void and not enforceable.

IV. It is claimed by the appellant that where an ordinance regulating the use of private property punishes violations of its provisions by criminal penalties so great as to discourage resort to the courts to determine its validity, or so great as to be confiscatory, or vastly out of proportion to the ends sought to be attained, such ordinance is void, regardless of the validity of its other provisions.

By the terms of Section 14 of the ordinance, any violation of any of the provisions of the ordinance may result in conviction and a fine not exceeding $100.00, or imprisonment for a term not exceeding 30 days, and each day that any person shall continue to violate or fail to comply with any provision of the ordinance shall be considered a separate offense.

Under the provisions of section 5, the committee of safety may from time to time, ''require such repairs, additions, alterations or changes in such magazines, appurtenances and premises and the manner of using and operating the same, as may be necessary to secure compliance with the provisions of this or any other ordinance of the City of Sioux City, or any law.''

By section 13, the magazines, structures, valves, pipes and accessories connected with such premises must be kept and oper-

ated in compliance with law, the building code, and other city ordinances, and in a safe and proper manner, and the same shall not be permitted to become or remain defective, hazardous, or dangerous.

As previously stated, these are vague and indefinite requirements. Nevertheless, violations are punishable by fines of $100.00, or 30 days' imprisonment, and each day that a person shall continue the violation is a separate offense, and so punishable.

In Ex parte Young, 209 U. S. 123, 52 L. Ed. 714, 28 Sup. Ct. 441, the validity of the acts of the Minnesota Legislature fixing railway freight and passenger rates was involved. One ground of the attack upon the acts was that the criminal penalties imposed for violations were so great as to make the acts invalid upon their face, and the courts sustained this proposition, saying:

"Coming to the inquiry regarding the alleged invalidity of these acts, we take up the contention that they are invalid on their face on account of the penalties. For disobedience to the freight act the officers, directors, agents and employees of the company are made guilty of a misdemeanor, and upon conviction each may be punished by imprisonment in the county jail for a period not exceeding ninety days. Each violation would be a separate offense, and, therefore, might result in imprisonment of the various agents of the company who would dare disobey for a term of ninety days for each offense. Disobedience to the passenger rate act renders the party guilty of a felony and subject to a fine not exceeding $5,000 or imprisonment in the state prison for a period not exceeding five years, or both fine and imprisonment."

After quoting from Cotting v. Kansas City Stock Yards, 183 U. S. 79, 46 L. Ed. 92, 22 Sup. Ct. Rep. 30, the court continued:

"We hold, therefore, that the provisions of the acts relating to the enforcement of the rates, *either for freight or passengers,* by imposing such enormous fines and possible imprisonment as a result of an unsuccessful effort to test the validity of the laws themselves, are unconstitutional on their face, *without*

*regard to the question of the insufficiency of those rates.''*
(Writer's italics.)

In Bonnett v. Vallier, 116 N. W. (Wis.) 885, 17 L. R. A.
(N. S.) 486, the court had under consideration an ordinance
regulating the construction of tenements and lodging houses.
The court said:

"There is another general feature of the act which arrests
our attention, and that is the penal clause, particularly in view
of the recent decision of the Federal Supreme Court, that, where
a police regulation is sought to be made effective by danger of
such punishment for violations thereof and such burdens upon
unsuccessful effort even to test its validity as to intimidate
parties affected thereby from resorting to the courts in the mat-
ter, as to practically prohibit them from seeking any judicial
remedy for supposed wrongs inflicted upon them, denies to them
equal protection of the laws, and renders the whole act void ir-
respective of whether its provisions would otherwise be valid.''

In State v. Crawford, 133 Pac. (Wash.) 590, a statute made
it a gross misdemeanor for a street railway company or its em-
ployees to charge more than 5c per ride. Punishment was im-
prisonment in the county jail for not more than one year or a
fine of not more than $1,000 or both. The court said:

"The Attorney General argues that the statute gives the
courts a wide discretion in the matter of punishment, and that
they are permitted to impose a fine as low as one cent and to im-
pose a jail sentence as short as one hour. This is true, but it is
also true that their discretion would permit the maximum sen-
tence.''

The criterion is the maximum of the punishment. More-
over, in the instant case, this maximum of punishment may be
for each and every day that the owner passively permits what
is considered by the inspector a violation of the requirement that
the equipment shall not "become or remain defective, hazardous
or dangerous.''

Under the terms of this ordinance, a filling station must be
kept in a "safe and proper manner.'' The owner may not know
for many days, weeks, or even months that he is violating the
ordinance, for there is no yardstick by which his conduct is to

be measured; but if the officer finally concludes that a violation has existed, the owner may be prosecuted as for a separate and distinct offense for each day of this period during which the owner has maintained the structure or equipment in a manner to be considered by the officer as in violation of the ordinance. Guarantees against such possibilities are found in the 14th Amendment to the Constitution.

As was said in Federal Trade Commission v. Millers' Nat. Federation, 23 Fed. (2nd) 968, by the court of appeals of the District of Columbia with reference to this point, quoting from Terrace v. Thompson, 263 U. S. 197, 68 L. Ed. 255, 44 Sup. Ct. 15:

" 'They (the owners) are not obliged to take the risk of prosecution, fines and imprisonment, and loss of property in order to secure an adjudication of their rights.' "

The ordinance in the case at bar applies only to buildings and equipment already constructed, or to new ones *after* they are completed. Consequently, the ordinance can only be enforced by and through the criminal provisions. If these are void, then the ordinance as a whole becomes unenforceable. See Marland Refining Co. v. Hobart, 237 Pac. (Okla.) 857; Massinger v. Millville, 43 Atl. (N. J.) 443; Brannon v. Wilmington, 165 N. E. (Ohio) 311; Omaha v. Harmon, 78 N. W. (Nebr.) 623; German American Fire Ins. Co. v. Minden, 71 N. W. (Nebr.) 995.

It is apparent that under the rules announced in the cases the excessive fines and penalties which may be inflicted under this ordinance make it void.

■ V. It is next contended by the appellant that because the ordinance is arbitrary and unreasonable in its classification, it deprives the plaintiffs of equal protection of the laws and deprives them of their property without due process of law. The claim is not made against the power of classification. It is made against the manner in which it is made. That is to say, it is claimed that the classification is unreasonable and unnatural. It is evident that the only basis upon which it can be reasonably claimed that the ordinance is not merely a taxing device is to claim that it has been passed for the purpose of promoting the *safety* of these magazines. The ordinance only purports to

deal with persons maintaining magazines where inflammable oils are *kept for sale*. The record shows that there are maintained in Sioux City many inflammable oil magazines in excess of 120 gallons' capacity containing inflammable oils *kept not for sale*. For illustration, the Fairmount Creamery Company has a gasoline tank of ten or twelve thousand gallons' capacity in which inflammable oil is being stored for use in the trucks belonging to the company. They also have a fuel oil tank of twenty to thirty thousand gallons' capacity. Swift & Company has a ten thousand gallon capacity gasoline tank. Others might be named.

How can it be claimed that an ordinance should apply to storage tanks where inflammable oils are kept in bulk, and from which the supply is furnished from day to day to replenish filling stations, and should not apply to storage tanks of equal or much greater capacity where inflammable oils are kept, although not for sale? Inflammable oil is not made more so by reason of its sale.

The record discloses that by reason of the care with which retail oil stations are managed, fires and explosions therefrom are rare. The record also discloses that fires occur in bulk stations where inflammable oils are kept not for sale. Moreover, it appears there are about 25 dry-cleaning plants in Sioux City which use high-test gasoline and have over 120 gallons' capacity. The ordinance does not apply to those concerns because they do not keep gasoline *for sale*. The record discloses that the fire hazard from these dry-cleaning plants is very high. It appears there have been only two oil station fires in Sioux City in a period of 8 or 9 years, while there have been 8 or 10 a year in cleaning plants. The testimony discloses that the fire hazard in cleaning plants is classified by experts as very high. Upon what basis of rule or reason may an ordinance be sustained which does not apply its license or regulatory features or tax to dry-cleaning plants solely because they do not sell inflammable oils?

It also appears there are many fuel oil tanks in Sioux City, varying in size from 250 to 1000 gallons' capacity. It is shown that the fire hazard on these plants is greater than on coal-burning furnaces. It appears that the fire hazard on gasoline filling stations and oil-burning heating plants is about the same, and this because of the care exercised in filling stations.

*Safety* being the only basis upon which the ordinance can

be justified, if it is seriously contended that it is not purely a revenue measure, the discriminations disclosed render the ordinance void. This question was very recently passed upon by the Supreme Court of the U. S. (May 25, 1931), in Smith v. Cahoon, 75 L. Ed. 1264. It deals with a statute of the state of Florida, which required operators of motor vehicles for hire to carry liability insurance for the protection of the public, but exempted from this requirement operators engaged exclusively in transporting farm and sea-food products to the primary market. The court said:

"In determining what is within the range of discretion and what is arbitrary, regard must be had to the particular subject of the state's action. In the present instance, the regulation as to the giving of a bond or insurance policy to protect the public generally, in order to be sustained, must be deemed to relate to the public safety. * * * But in establishing such a regulation, there does not appear to be the slightest justification for making a distinction between those who carry for hire farm products, or milk or butter, or fish or oysters, and those who carry for hire bread or sugar, or tea or coffee, or groceries in general, or other useful commodities. So far as the statute was designed to safeguard the public with respect to the use of the highways, we think that the discrimination it makes between the private carriers which are relieved of the necessity of obtaining certificates and giving security, and a carrier such as the appellant, was wholly arbitrary and constituted a violation of the appellant's constitutional right. 'Such a classification is not based on anything having relation to the purpose for which it is made.' "

In this connection, it will be borne in mind that section 5764 was originally a part of the Code of 1860. It then provided:

"Section 1057. They shall have power * * * to regulate the transportation and keeping of gunpowder or other combustibles, and to provide or license magazines for the same * * *."

In 1888, by Section 1, Chapter 16, of the Laws of the 22nd G. A., the following was added:

"To provide that magazines used for the keeping of gunpowder, inflammable oils and other combustibles, shall not be

located or maintained within a certain distance of the corporate limits of such cities."

The reading of the statute and its history clearly shows that it originated and has been changed from time to time as a means of authorizing cities to regulate the business in the interests of safety only.

We are not to be understood as passing upon any of the questions which might arise as to whether filling stations or other structures as the same are shown to be used in Sioux City are included in the term "magazine." Those questions are not before us in this case.

In harmony with Smith v. Cahoon, supra, attention is called to State v. Sheridan, 170 Pac. (Wyo.) 1, 1 A. L. R. 955, in which an ordinance which required a license for makers of concrete, and not for makers of other types of walks, was held discriminatory. The court said:

"'* * * the classification must be reasonable in view of the object sought to be accomplished. The discrimination must rest upon some reasonable ground of difference between the persons or things included and those excluded, having regard to the purpose of the legislation, and within the sphere of its operation, the statute must affect all persons similarly situated.'"

See also State v. Sherman, 18 Wyo. 169, 176, 27 L. R. A. (N. S.) 898, 105 Pac. 299, Ann. Cas. 1912C, 819.

In Lincoln v. Lincoln Gas Co., 158 N. W. 962 (Nebr.), the court held that when there are several public service corporations engaged in furnishing heat, light, and power to the people of a city, and occupying the streets, alleys, and public places of the city with their apparatus for that purpose under franchise granted by the city, the fact that one furnishes heat, light, and power by electric current conveyed by wires, and the other by gas conveyed by underground mains, does not furnish a sufficient basis for classification to justify levying an occupation tax upon one of such companies and not upon the other. A tax so levied is void for unjust discrimination.

In State v. Osborne, 171 Iowa 678, this court condemned what is commonly known as "the transient merchant act." It is apparent that the classification employed in this ordinance

"is not based on anything having relation to the purpose for which it is made."

It follows that the cause must be, and is,—Reversed.

WAGNER, C. J., and EVANS, STEVENS, FAVILLE, ALBERT, MORLING, and KINDIG, JJ., concur.